**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| EUNICE ARROYO-PEREZ | |
| Plaintiff | CIVIL NO. 09-2231 CVR |
| v. | JURY TRIAL DEMANDED |
| DEMIR GROUP INTERNATIONAL, Inc., a.k.a DGI GROUP; and HAYGO DEMIR, a.k.a HAYGO DEMIRIAN | |
| Defendants | |

## Proposed Pretrial Order

# TABLE OF CONTENTS

1. Counsel for the parties ....................................................... 1

   A. Plaintiff ........................................................................ 1

   B. Defendants .................................................................... 1


2. Factual statements of the parties ...................................... 2

   A. Plaintiff ........................................................................ 2

      1. DGI Canada and Florida - Intermingled and under
      the complete control of Mr. Demir ...................................... 2

      2. Plaintiff's Tenure at DGI - her positions, compensation,
      and her dismissal in 2008 ................................................... 4

      3. Ms. Arroyo's pregnancy and the reaction of the company
      to her and other pregnant employees ................................... 5

      4. The downsizing explanation — sheer pretext ................. 12

      5. Retaliatory acts on the part of Demir and DGI ............... 20

      6. Damages ...................................................................... 22


   B. Defendants ................................................................... 27

      1. Introduction ................................................................. 27

      2. DGI's Business ............................................................. 28

      3. DGI Hires Arroyo ......................................................... 29

      4. Financial Hardship and Slowed Economy Forces DGI
      to Terminate Employees, Cut Pay, and Borrow Money ........ 29

5. Arroyo was Promoted to a Territory Manager ................... 32

    i. Arroyo's Sales Were Extremely Low ........................... 32

    ii. Arroyo Failed to Effectively Communicate
    with her DGI Colleagues ................................................ 34

    iii. Arroyo Failed to Effectively Communicate with
    her Customers ............................................................. 35

6. Arroyo's Employment at DGI is Terminated .................... 36


3.  Each party's contentions with respect to controverted
material facts, contested issues of law, evidentiary questions ........... 38

    A. Plaintiff ............................................................... 38

    i. Factual Controversies ............................................... 38

    a. Whether DGI eliminated its bonus program in 2008 ....... 38

    b. Whether DGI failed to pay plaintiff her earned
    vacation pay ............................................................. 39

    c. DGI in 2008 - did economic problems cause
    plaintiff's discharge? .............................................. 39

    d. Whether plaintiff's action in retaining control over jewelry
    was justified........................................................... 40

    e. The value of the jewelry ........................................ 41


    ii. Legal Controversies .................................................. 40

    a.  Whether Title VII and Puerto Rico statutes cover
    discrimination up to and including a termination several
    months after an employee returns from maternity leave .... 40

    b. The number of employees — whether Canada counts for
    Title VII purposes: ................................................... 43

      c. Number of employees for Law 80 purposes ............................. 43

**iii. Mixed Legal and Factual Controversies** ......................................... 46

    **a. The single employer issue** ........................................................ 46

    **b.  Whether plaintiff was the victim of pregnancy and
gender discrimination:** ......................................................... 46

    **c. Whether plaintiff has made out a case of retaliation:** .............. 47

    **d. Whether defendants can demonstrate "just cause" for the
employment actions against plaintiff, as set forth in Law 80 and
in pari materia in Puerto Rico laws prohibiting discrimination** .... 48

    **e. Whether defendants can demonstrate a legitimate basis for their
employment decisions pursuant to federal law** ................................ 49

    **f. Whether the purported legitimate business reasons are
mere pretexts:** ..................................................................... 49

    **g.  Whether plaintiff made out a tort injury** .................................. 50

    **h.  Mitigation** ............................................................................. 52

**iv. Evidentiary Issues**

    **a. Admissibility of post-hoc litigation summaries and pie charts**.......... 53

    **b. Defendants' objections to plaintiff's job-search documents** .............. 54

**B. <u>Defendants</u>** ............................................................................. 54

  **i. Factual Controversies** ............................................................... 54

    **a. Whether DGI eliminated its bonus program in 2008** ......................... 55

    **b. Whether DGI failed to pay plaintiff her earned vacation pay** ............. 55

    **c. Whether DGI was suffering economic problems in 2008** ..................... 55

**d**. **The Level of Arroyo's Arroyo's Work Performance In Relation to Other Territory Managers** ................................................. 55

**e.  Whether plaintiff retained property belonging to defendants**............ 56

**f. Whether Plaintiff Properly Mitigated her Damages** ........................ 56

**g. Which DGI Employees are Subject to Law 80?** ................................. 57

**ii. Legal Controversies** ................................................................. 57

**a.  Whether Title VII and Puerto Rico statutes cover discrimination up to and including a termination several months after an employee returns from maternity leave** ................ 58

**b. The number of employees — whether Canada counts for Title VII purposes:** ...................................................................... 58

**c. Number of employees for Law 80 purposes** ........................................ 61

**iii. Mixed Legal and Factual Controversies** ................................................. 66

**a. The single employer issue:** ................................................................. 66

**b.  Whether plaintiff was the victim of pregnancy and gender discrimination:** ................................................................. 66

**c. Whether plaintiff has made out a case of retaliation:** .............. 66

**d. Whether defendants can demonstrate "just cause" for the employment actions against plaintiff, as set forth in Law 80 and in pari materia in Puerto Rico laws prohibiting discrimination** .... 68

**e. Whether defendants can demonstrate a legitimate basis for their employment decisions pursuant to federal law** ................................. 69

**f. Whether the purported legitimate business reasons are mere pretexts:** ................................................................. 69

**g.  Whether plaintiff made out a tort injury** ................................... 70

**iv. Evidentiary Issues** ....................................................... **70**

**a. Pie Charts** .................................................. **70**

**b. Incomplete Job Search Documents** ........................ **70**

**4.** **Proposed Stipulations of the parties** ................................ **70**

**5.** **Witnesses other than those used for impeachment and rebuttal** ......... **72**

**A.  Plaintiff** ................................................................. **72**

**(1) Plaintiff's witnesses** ........................................ **72**

**(2) Plaintiff's responses to defendants witnesses and
deposition designations** ................................... **83**

**B.  Defendants** ............................................................ **109**

**(1) Defendants' witnesses** ................................... **109**

**(2) Defendants' objections and counter-designations
to plaintiff's witnesses** ............................... **117**

**6. Documents each party intends to introduce at trial** ....................... **112**

**A.  Plaintiff** ................................................................. **112**

**i. Those for which admissibility is stipulated** ............................. **112**

**ii. Those for which admissibility is contested** ............................. **114**

**B.  Defendants** ............................................................ **128**

**i. Those for which admissibility is stipulated** ............................. **128**

**ii. Those for which admissibility is contested** .......................... **132**

**C. Joint Exhibits** ......................................................... **142**

7.  Expert Witnesses ............................................................................  142

      None

8. Claims abandoned or defenses waived or abandoned .................................  143

      None

9.  Pending motions ............................................................................  143

      None

10.  Estimated days required for trial for each party .......................................  143

      A. <u>Plaintiff</u> ...............................................................................  143

      B. <u>Defendants</u> ............................................................................  143

11.      Date of trial and problems for attorneys ...............................................  144

12.      Trial by Magistrate Judge .................................................................  144

13.      Other matters  ...........................................................................  144

      A. <u>Plaintiff</u> ...............................................................................  144

          i. Depositions .........................................................................  144

          ii. Counter-designations of depositions should be limited to
            the scope of direct unless separately presented during the
            opposing parties' case in chief ...............................................  145

          iii. Testimony by adverse parties and those identified with
            a party in plaintiff's presentation of her case in chief --
            limits on examination by the defendants ..............................  145

**iv. The jury cannot be informed of the statutory caps or of the automatic doubling of damages** ...................................... **147**

**B. <u>Defendants</u>** ........................................................................... **147**

**14.**    **Reservations** .................................................................... **133**

1.      **COUNSEL FOR THE PARTIES (Names, mailing and email addresses, telephone numbers and facsimile numbers)**

**A. Plaintiff**

Plaintiff Eunice Arroyo is represented by Judith Berkan and Mary Jo Méndez, Berkan/Méndez, Calle O'Neill G-11, San Juan, Puerto Rico 00918-2301; tel 787-764-0814; fax 787-250-0986; berkanj@microjuris.com; mendezmaryjo@microjuris.com and bermen@prtc.net

**B. Defendants**

Defendants are represented in the instant case by the following counsels:

        SCHLESINGER & COTZEN, P.L.
        799 Brickell Plaza, Suite 700
        Miami, Florida 33131
        Phone: 305-373-8993
        Fax: 305-373-8090

        Michael J. Schlesinger
        Florida Bar No. 141852
        mjs@scflalaw.com

        Michael L. Cotzen
        Florida Bar No. 166472
        mc@scflalaw.com

        Ferraiuoli Torres Marchand & Rovira, P.S.C.
        Plaza Building, Suite 403
        #221 Ponce de León Avenue
        San Juan, Puerto Rico 00917
        Telephone: (787) 766-7000
        Fax: (787) 766-7001

        María Judith Marchand-Sánchez
        USDC-PR No. 206602
        nmarchand@ftmrlaw.com

        Juan R. Rivera-Font
        USDC-PR No.221703
        jrivera@ftmrlaw.com

## 2. FACTUAL STATEMENT OF EACH PARTY'S CLAIM OR DEFENSE, INCLUDING ITEMIZED STATEMENT OF ANY DAMAGES CLAIMED

### A. Plaintiff

### 1. DGI Canada and Florida - Intermingled and under the complete control of Mr. Demir

Plaintiff Eunice Arroyo started working for DGI in August, 2005.  DGI is a company which distributes different brands of jewelry to retailers in the Caribbean, Mexico and Alaska. DGI is owned by one man, defendant Haygo Demir, the individual defendant in this case.   At the time plaintiff began working at the company, it was based in Canada, where Mr. Demir resided with his wife and children, although the business of the company was operated through the main office in Canada, the Miami office, where several employees were based, and through the efforts of sales people in other areas, such as Puerto Rico and Grand Cayman.

When plaintiff began working at DGI, she received an email providing her with an "Employee Contact Information"from Brian Taylor, Mr. Demir's father-in-law, who identified himself as being from "DGI Head Office, in Toronto, Canada."   The list shows a total of eighteen (18) employees (in addition to Mr. Demir), divided as follows:  Eleven (11) employees in the "home office"in Canada; Four (4) "Field Reps" in the "Miami Office"; One "Field Rep" in the Toronto Office; Two "Field Reps" in Puerto Rico (Ilianny Mera and plaintiff Eunice Arroyo); and One "Field Rep" in St. Thomas.  Most of DGI's employees are women, who make certain that the jewelry lines are distributed to key retailers for sales (on which DGI makes a commission).  In general, they are attractive young women, who usually do not have childcare responsibilities.

Demir Group International, Inc. is a company registered in Canada and solely owned by

Haygo Demir, which he sometimes refers to as "DGI Canada." In approximately 2004, Mr. Demir incorporated a different company in the State of Florida, with the exact same name, which he calls "DGI Florida," and which, like DGI Canada, is under his sole ownership. In reality, DGI Canada and DGI Florida are a single company, under the complete control of Mr. Demir. There is no corporate separateness between DGI Florida and DGI Canada, which will be referred to herein collectively as "DGI."

As President, Secretary and Treasurer of the Florida corporation, Mr. Demir is the sole Officer of DGI Florida. He is also the President, Secretary and Treasurer, and thus the sole Officer of the Canada corporation. Neither DGI Canada nor DGI Florida has a board of directors. The Corporate documents of both corporations provide that Haygo Demir is the "Sole Member of the Board of Directors."

Monetary matters are similarly intermingled. Haygo Demir, as the principal in both corporations, decides which money goes into which. He also decides which company he will withdraw money from for his own services and expenses. He started receiving an income from the Florida company out of the company in Florida as of January 2010. Before that, beginning in about 2003, he derived an income from the Canada corporation. At times, he would just take whatever was left over on a month to month basis and would take dividends or (shareholder advances) in addition to that, estimating that he took $25,000 in 2006 and $10,000 in 2007).

DGI represents different lines of jewelry and makes commissions on sales of jewelry. The sales realized by different employees, assigned either to Florida or Canada, were counted as income to one of the two companies, depending on the brand. According to Mr. Demir, money from the Canada corporation has been "shifted ... from Canada to the United States. Certain commissions

3

previously assigned to Canada were switched over to Florida between 2006 and 2007.

Mr. Demir, also took advantage of the fact that he had such absolute control over his two companies to illegally claim expenses which were incurred by the Florida corporation as expenses of the Canada corporation.  This accounting manipulation, done with respect to DGI's expenses during tax year 2008, meant that DGI illegally claimed double expenses that year, reducing his tax obligations and improperly reflecting DGI's true earnings and financial situation during 2008.

Counsel for Mr. Demir and DGI has stipulated that for the purpose of Title VII provisions, DGI Canada and DGI Florida are a single employer and that the combined "DGI" had more than 15 employees for each of 20 calendar weeks during 2007 and 2008.

### 2. Plaintiff's Tenure at DGI - her positions, compensation, and her dismissal in 2008

Plaintiff began her tenure at DGI as a Territory Assistant for Iliany Mera, a Territory Manager who was based in Puerto Rico and who covered several Caribbean islands.  Ms. Arroyo's initial salary was $40,000.00 per year.  On June 1, 2006, she received a $5,000.00 raise.  Within a month, she received another $5,000.00 raise, increasing her salary to $50,000.

In early 2007, Ms. Arroyo was promoted to the position of Territory Manager, originally covering Puerto Rico and the Dominican Republic.  A few months later, her territory was expanded to cover Antigua, Barbados, St. Lucia, Dominica and Trinidad as well.  By mid-2007, plaintiff's salary had increased to $55,000.00 a year, plus bonuses.

Ms. Arroyo enjoyed her work immensely.  Although she had one small child at home in Puerto Rico, she enjoyed the travel she engaged in for the company.  It was also important to the

financial well-being of her family, since she earned well in excess of the compensation received by her husband.  She also applied knowledge she had gained from her previous work as a model for famed designed Gustavo Arango, in her other work from him and in other jobs she had prior to working at DGI, primarily in the mortgage industry.  She received excellent feedback as to the quality of her work and was rewarded financially for her efforts.

For her work in 2007, plaintiff received the *second* highest bonus of all five Territory Managers entitled to bonus, an amount in excess of $7,200.00, just $29 less than the highest bonus. Two of the five employees did not show enough growth to merit a bonus, and a third received some $3,000 less than Ms. Arroyo.

In October, 2008, Ms. Arroyo was informed that she was being dismissed from DGI supposedly to "downsizing."  Her dismissal came just three months after Ms. Arroyo returned from maternity leave, after giving birth to her second child.  The dismissal also came after Ms. Arroyo's territory had been severaly limited upon her return from maternity leave, with most of the islands she had previously covered being assigned to a newly hired employee, who had replaced Ms. Arroyo during her maternity leave.

### 3. Ms. Arroyo's pregnancy and the reaction of the company to her and other pregnant employees

In September  of 2007, at a conference in Las Vegas attended to by the DGI sales staff, plaintiff informed Haygo Demir that she was pregnant.  Mr. Demir responded in a manner which was wholly unprofessional, treating the news with derision and disbelief, asking Ms. Arroyo if she was "pulling his leg.  He just turned away and began listening to a speaker at the event.  Ms. Arroyo

became teary and told Mr. Demir that she was not "kidding."

Ms. Arroyo was very upset, and she immediately feared for her job. Over the years, she had noticed and become aware of the fact that pregnant employees were not welcome in DGI, a company which employs beautiful young women to travel to distant places to sell jewelry. She knew of other young women who had been employed by the company but who never returned after their maternity leave. Although Ms. Arroyo knew that she could handle the job responsibilities both during her pregnancy (when, admittedly, her physical appearance would change) and thereafter, she was afraid that the company would not allow her to do so.

In fact, the first hint plaintiff had that Mr. Demir and/or DGI had issues with pregnant employees or those with motherhood responsibilities came about when plaintiff was first offered the job at DGI. Mr. Demir told her that although she was a good candidate for employment with DGI, his major concern was that Ms. Arroyo had a child. Plaintiff told him that she had support from her husband and family, and that she had a full-time care-giver for her child. She asked him to give her an opportunity to see if she could do the job, even having a small child at that time.

Others present at the Las Vegas conference noticed the effect Mr. Demir's comments had on the plaintiff. Tiffany Cox was a newly recruited Territory Manager (whose salary was considerably higher than Ms. Arroyo's despite her lack of experience, and, in fact, was raised during the times of supposed "downsizing.") Ms. Cox could tell that Ms. Arroyo felt that Mr. Demir had "kind of brushed her off, had kind of blew her off." She told Mr. Demir that she felt he had not acted appropriately.

It was not until some time later, in an email sent on September 22, 2008, that Mr. Demir apologized for the inappropriate response, saying that he was "sorry that [he] didn't give the

6

response" that Ms. Arroyo was "looking for."  In that same email, however, he started peppering Ms. Arroyo (whose due date was seven months away) as to "how long [she] planned] on working," whether she would still be available for travel, how long her maternity leave would last, and whether or not she "planned] n returning to work after [her] maternity."

Although plaintiff wrote back saying that she had not taken his reaction in a bad way, her impression from Mr. Demir's email was that she was being treated as if she were handicapped or disabled, making her respond that pregnancy was not an "incapacity." On the other hand, she was sufficiently concerned about the situation to write to a co-worker a Spanish-language email stating that "it bothers me that [Mr. Demir] is asking if I will continue to work after giving birth.  I DON'T UNDERSTAND.  What's going on with him?"

 Once plaintiff announced that she was pregnant, she noted a change in attitude on the part of Mr. Demir. According to plaintiff, "everything changed when [she] was pregnant." As the months went by, moreover, she was subject to intense pressure regarding her due date and her responsibilities.

During the months following the Hearts on Fire Conference, plaintiff began receiving a series of emails asking for the exact dates of her pregnancy and expected due date, even though this was a long time before she was scheduled to give birth.   On December 11, 2007, close to five  months before Ms. Arroyo's due date, Krystal Williams, of the DGI Management in Canada, was already requesting information from plaintiff as to a tentative date when she would be going on maternity leave. Plaintiff immediately informed her supervisor of her expected due date in a return email the following day.  This, however, did not prevent Ms. Williams from writing to plaintiff again a month later, requesting the exact same information, and ignoring the response by plaintiff sent over five

weeks earlier.  The barrage of emails continued with one later that day asking "so you will be working right up to you have the baby?"

The pressure became so intense that plaintiff felt she had to inform the company that only "God" knew when she would give birth.  The company also pressured her to provide extensive information about her work, to provide details about what she was doing, although reports of her work were prepared as a regular event at DGI.

Ms. Arroyo was given the impression that the company fully expected her to leave DGI once her second child was born.  The pressure caused her major emotional sufferings during her pregnancy.

The company's hostility to pregnant employees and to those with maternal responsibilities was evident to other employees, not only with respect to Ms. Arroyo.  Besides the fact that DGI employees who became mothers never seemed to return to work, Mr. Demir was prone to making negative comments about pregnant women, joking in front of customers and employees about such matters.

Ms. Arroyo's daughter was born on May 1, 2008.  At that point, she began her statutory eight-week maternity leave, required under the law of Puerto Rico.   Despite this, she continued to work, as needed, for DGI, resolving issues even when taking the time off required by law.  In the meantime, DGI assigned Territory Assistant Chancel Rome, a Miami-based employee with considerable less seniority in the company, to cover most of Ms. Arroyo's responsibilities as a Territory Manager covering the islands mentioned above.

In mid-June, 2008, while plaintiff was still on maternity leave, Haygo Demir informed her that her territory was being reduced.  Chancel Rome was assigned to cover all of plaintiff's

territories, except for the Dominican Republic and Puerto Rico, receiving a $7,000 salary increase in light of the added responsibilities.

In May of 2008, an important show was held in Las Vegas.  Although plaintiff had recently given birth, she specifically informed the company on several occasions that she intended to go to the show and that she had taken care of her childcare needs.  DGI did not permit plaintiff to attend the Las Vegas  show, despite Ms. Arroyo's expressed interest in attending the show and her expression to the company that she would be willing and able to do so.

It is at shows such as Las Vegas that many sales are written. At the Las Vegas show in 2008 (to which plaintiff was not allowed to go) there were some $15 million dollars in orders, with about $2 million dollars actually shipped out that year.    The show, according to Mr. Demir, was "absolutely the largest show in the history of the company."

After the Las Vegas Show, Mr. Demir suggested to plaintiff that she take off six months, without pay, in order to deal with her new maternal obligations.  Plaintiff never agreed to take such a lengthy period of time off.  She could not do so, due to the economic needs of her family.  Despite this, Mr. Demir, who evidently believes that women with children and maternal responsibilities do not fit into his picture of DGI sales personnel, told Rachel Diehard, DGI Vice President of Finance and Operations that plaintiff, herself, had decided to take 6 months off after giving birth, on unpaid leave.

In the entire history of DGI, there has never been a Territory Manager who had her baby and came back to work at DGI within the first few months of giving birth.

In the company, there are absolutely no written rules concerning maternity leave.  There is no employee manual, although a draft was written and never distributed. When an employee starts

out in the company, she is not informed of the company rules regarding maternity leave.   Ms. Arroyo expressed her concern to the company that there were no manuals, making it easy for company officials to act in an arbitrary fashion.

Despite the fact that plaintiff was an employee in Puerto Rico, and subject to the laws here, company officials, including Rachel Diehard, then the Vice President of Finance and Operation, understood that Ms. Arroyo was not entitled to *any* paid maternity leave.

On July 2, 2008, as plaintiff was nearing the end of her maternity leave, she received a communication from Ms. Diehard, informing her that the company had made a mistake, based on a "misunderstanding," when it paid plaintiff during her maternity leave.  At that time, Ms. Diehard informed Ms. Arroyo that she would have to pay the money back to DGI.

Plaintiff responded later that same day, after inquiring about the laws protecting pregnant women in Puerto Rico.  She stated that even though she was entitled to receive full pay and not to work during maternity leave pursuant to the law of Puerto Rico, she had actually worked during her leave.  She also explained that Puerto Rico laws allows for eight (8) weeks of paid maternity leave, and the matter was resolved that same day.

In light of all of the previous history with respect to Ms. Arroyo's pregnancy, and given the reality that employees at DGI never return after giving birth, the above incident caused extraordinary stress to Ms. Arroyo.

During plaintiff's maternity leave, plaintiff was informed by Haygo Demir that her territory was being drastically reduced and that Chancel Rome was being promoted to Territory Manager, with responsibility over the islands which had formerly been part of plaintiff's Territory, other than the Dominican Republic and Puerto Rico.  Mr. Demir offered no reason related in any way to

10

performance for this change (which, logically, would affect her sales and therefore her bonuses).

Ms. Arroyo was so upset by this reduction and so convinced that she was the victim of discrimination that she consulted with her sister, whose English is more fluent than hers, in order to draft a letter questioning the discrimination.  She decided not to send it, however, because she was already afraid of losing her job.

Ms. Arroyo officially returned to DGI from maternity leave in early July of 2008, to the Territory Manager position, but with considerably less responsibility than she had prior to the birth of her child.  It was just a little over a month later, in August, 2008, that DGI made the decision to terminate her (although she was not informed until two months later.)

It was also at about this time that Ms. Arroyo was informed that she would no longer report to DGI Canada, but would rather report to DGI Miami.  Ms. Arroyo has never traveled to Florida on DGI business.

After plaintiff returned from maternity leave, the company required of her a great deal of information from her about her work, beyond ordinary reports, leading her to believe that the company was getting rid of her. After she returned from maternity leave, plaintiff never again traveled on behalf of DGI.

Blanca Rodriguez, an officer of the company, who was the head of the Miami office, a Vice President, and the person who informed plaintiff that she was being fired, made an *admission* in an email she sent to plaintiff on December 19, 2008 in which she stated: *"In DGI in sales, there has never been anyone with children. Only Christina, and she had a nanny and was divorcing.  And she was also his [Demir's] partner."*

 On October 10, 2008, Ms. Arroyo was terminated from her employment.  She was told that

the reason for her discharge was "downsizing."   Within a week or two, the company fired María Cabiya, the only other employee who was pregnant.  Ms. Cabiya, who worked in the Miami office, was dismissed at a time when she was having major medical difficulties related to a high-risk pregnancy.  Ms. Cabiya felt undue pressure and hostility on the part of DGI related to her pregnancy.

Blanca Rodriguez, DGI Vice President in charge of the Miami office, was the member of the management team who was charged with discharging Ms. Arroyo. She immediately informed DGI management of her conversation with Ms. Arroyo, explaining that she had "used downsizing" as the explanation for the dismissal precisely because women who return from maternity leave cannot be discriminated against, and she was not certain whether plaintiff was aware of her rights.

### 4. __The downsizing explanation — sheer pretext__

Although it is certainly true that the jewelry business was feeling the shocks of the recession in 2008, the decision to dismiss plaintiff was made in August of 2008, more than a month before the collapse heightened in September of that year.

The claims by DGI and Mr. Demir that it was financial reasons which led to Ms. Arroyo's dismissal are mere pretext, as demonstrated *inter alia* by the following:

In 2008, Mr. Demir counted DGI's expenses twice, improperly charging the same expenses to both of his DGI corporations.  Although after Ms. Arroyo notified her claim to the company, DGI Canada made an adjustment, in the relevant year, expenses were billed twice.

Mr. Demir intermingled the two corporations so completely so as to make it impossible to see what, exactly, was the financial situation of one or the other.  The defendant also moves money from one DGI to the other.  He also has several other businesses, to some of which he also lends

12

money, only to write off these loans as "expenses."

In 2008, DGI Florida lent $89,000 to DGI Canada.  DGI Florida also lent $33,000 to Demir Partners Limited.   Such loans are hardly indicative of an economic problem at DGI Florida, the company to which plaintiff was told she now reported to at the time of her discharge.

The amounts that DGI Florida lent to other Demir companies are reported in DGI Florida's income taxes as assets.  The money kept increasing — from $170,000 in 2006 to $195,000 in 2007, to $223,000 in 2008.  Mr. Demir also writes off as "bad debts"or "unrecoverable expenses"  large amounts, which in truth are really just Mr. Demir moving money around his different businesses and/or personal accounts, and then *writing off* these loans to himself as "expenses" because they are "unrecoverable expenses."   One example of such manipulation is a loan which Florida DGI made to CGI, another company in which Mr. Demir is a principal. along with former employee, Cristina Cox.  The entire amount of this loan, in excess of $81,000, was then written off as an "unrecoverable expense."  Mr. Demir thus put over $80,000 into another of his company's, CGI, taking that money from DGI, a separate company.  Within a year, DGI wrote it off as a bad debt against income from DGI, thereby making it look like DGI was in worse shape than it really was.

According to DGI's tax returns for  2009, DGI Florida actually paid off a $52,757 debt it had to Haygo Demir, and then lent Mr. Demir, himself, a total of $181,618.  This constitutes additional evidence that DGI, itself, was not in the dire financial straits claimed by the defendants to justify plaintiff's discharge.

Independently of these maneuvers, whether or not DGI was in fact turning a profit in 2008 is certainly open to question.  In reality, the *Florida* DGI company showed *significantly* increased *revenues* in 2008, increasing its gross sales increasing *32.2%* over 2007.

13

During the period when defendants are claiming that Eunice Arroyo had to be dismissed as part of "downsizing," DGI expenses increased *dramatically.* In the Florida DGI, for example, "other deductions" (covering such items as entertainment, subscriptions, travel and car expenses) *increased* from $ 275,962 in 2007 to $ 689,367 in 2008, an increase of $409,405, or 148% in that year of "downsizing." Travel expenses simply went through the roof.  There was a dramatic rise of some $220,000 (or approximately 50%) in travel expenses of the combined two DGI's between 2007 and 2008 (when defendants claim that DGI was "downsizing").  DGI officials, including Mr. Demir and his chief operations employee, Rachel Diehard, as well as the accountant for DGI Florida, have offered contradictory and illogical explanations regarding this increase, clearly giving the impression that they are "dissembling" to cover the truth and the pretextual nature of the proferred reason for plaintiff's dismissal.  *See, Reeves v. Sanderson , 530 U.S. 133 (2000)*

During 2008, moreover, Mr. Demir painted a totally different picture of DGI's economic health, in a number of communications to employees.  In a letter Mr. Demir sent to DGI staff on January 1, 2008, with the title indicating that "the Future is so Bright," he stated that if the company "hit our targets," he expected three brands alone to bring about "$55 million in retail." DGI customarily takes a commission of 10% of sales  If the above figure of $55 million was reached, this would imply some $5 million in gross commissions to DGI *on three brands alone,* well in excess of the revenue recognized on DGI's tax returns.

Another reason for calling into question the explanation provided by the defendants and supposedly justifying plaintiff's discharge is the fact that DGI continued to need the services which plaintiff had rendered.   DGI has utterly failed to provide a logical explanation as to why *Eunice Arroyo*, one of the more senior Territory Managers, bilingual, with relevant prior experience, and

14

whose bonus was the second highest the previous year, was chosen for downsizing in 2008.

There is no doubt that the *only* Territory Manager supposedly "downsized' was the plaintiff. There is also no doubt that *immediately after* plaintiff was supposedly "downsized," another employee, Sabrina Badeau, became a *Territory Manager*.  There were *six* Territory Managers in October of 2008, when plaintiff was fired, and there were *still six* the next month after she was gone.

Three senior DGI Territory Managers remained at DGI after plaintiff was fired: Blanca Rodriguez and Krystal Sweeney, both long-time members of DGI management team, and Ilianny Mera, a Territory Manager with more experience than the plaintiff.

On the other hand, there were three additional Territory Managers with considerably *less* experience than that of the plaintiff: (1) Tiffany Cox, first hired as a Territory Assistant a year and a half after plaintiff had first had that position, who had been a Territory Manager for half as long as plaintiff.  Ms. Cox, who is not bilingual, was earning some $15,000 more than the plaintiff, had no prior relevant experience and is not bilingual; (2) Chancel Rome, who began at DGI in the summer of 2007, and only became a Territory Manager during Ms. Arroyo's maternity leave; and (3) Sabrina Bandeaux, promoted to the position of Territory Manager once plaintiff was fired.

In terms of salary, plaintiff received a salary which was $30,000 *less* per year than that received by both Krystal Williams and Blanca Rodriguez, and $15,000 *less* per year than that received by Tiffany Cox at the time plaintiff was discharged.  Had the less senior employee, Tiffany Cox, been discharged, the decision would have saved DGI more than the decision to dismiss the plaintiff.

Chancel Rome, moreover, had just received a $7,000 increase when the decision to dismiss plaintiff was made.  As an employee based in Miami, moreover, travel costs associated with the

Caribbean territories she covered would necessarily be greater.

Yet another fact establishing the need to call into question the true reason for plaintiff's discharge, establishing the pretextual nature thereof, is the fact that the company continues to make up new reasons which supposedly justify her termination.  While the company at the time stated that it was "downsizing" due only to financial reasons and that performance had nothing to do with it, as the litigation progressed, the company attempted to come up with other performance-related explanations.   Plaintiff went from being the employee whose territories were growing at breakneck speed and who was consistently told by the company that she was doing an excellent job to the "worst" territory manager in DGI's history.

The notion that plaintiff was doing a poor job directly contradicts *contemporaneous* statements made by Mr. Demir himself, who wrote to plaintiff about a year before her termination stating that she was a "great contributor to this company and are loved by all that work with you." In a "State of the Union" distributed to DGI on January 1, 2008, just nine (9) months before Eunice Arroyo was fired, Mr. Demir stated that Ms. Arroyo was becoming a "veteran" in DGI and a "very valuable performer." Shortly thereafter, he wrote to Ms. Arroyo, congratulating her on doing a "really nice job" and stating the Puerto Rico work was "strong despite the economic troubles that have plagued the island."  He congratulated her on her wok in a visit to Puerto Rico just months before she was fired.

There are no contemporaneous documents suggesting that plaintiff was doing a poor job, although the defendants now point to "communication problems" with respect to plaintiff, claiming she did not maintain sufficient communication with her supervisors or her customers.

In support of this notion that plaintiff was fired because she failed to communicate,

defendants were able to locate only two emails from plaintiff's long-time supervisor, Krystal Williams.  Both of these emails were sent in late November, 2007, *in the context of plaintiff's anticipated maternity leave.*  These late November, 2007, emails were sent a full *ten months after* plaintiff became a Territory Manager*, and only *after* plaintiff told Mr. Demir that she was pregnant, in the context of planning for her upcoming absence from the job.

Neither Krystal Sweeney nor Mr. Demir ever put any concerns in writing about this supposedly grave problem.  Asked to produce the *documents* which would evidence this concern regarding plaintiff's failure to "communicate," all Mr. Demir could refer to were the two November, 2007 emails mentioned above from Ms. Williams to plaintiff, and  one email from Mr. Demir himself, several months later, *praising* plaintiff's work and telling her not to be so humble about her achievements, but to tout her own horn more.

Defendants also rely on the fact that Chancel Rome did not feel that communications with Ms. Arroyo were adequate.  Ms. Rome did not even meet Eunice Arroyo in person until March of 2008, less than two months before plaintiff's maternity leave, when Ms. Rome traveled to Puerto Rico in anticipation of plaintiff's upcoming leave.  Ms. Rome wanted, and eventually got, Ms. Arroyo's job as a Territory Manager.

Although the defendants also claim that plaintiff failed to maintain communications with her customers, there are no witnesses who say this, and no contemporaneous documents on this point, with one absurd exception, in which defendants assert that plaintiff should be faulted for having failed to communicate with a customer in Barbados at a time when, *due to pregnancy-related ailments,* plaintiff had been admitted to a *hospital*, and was on a gurney in a hallway, attached to an IV drip, vomiting intensely.  Plaintiff  had " mala barriga" (stomach issues associated with

17

pregnancy), and was her hemoglobin had dropped dramatically.

Defendants have also asserted that plaintiff was a poor sales person. Contemporaneous documents, however, indicate the contrary, particularly with respect to growth in her territory. In her last full year on the job, 2007, plaintiff obtained the second highest bonus of the employees entitled to bonuses based on their sales, and she received only some $29 than the employee receiving the highest bonus.

While the above clearly demonstrates the hopelessly pretextual nature of the defendants' purported reasons for plaintiff's discharge, by far the most telling evidence of pretext comes from the horse's mouth, a "smoking gun" email sent by DGI Vice President Blanca Rodriguez to Mr. Demir on October 11, 2008, the day after she informed Ms. Arroyo that she was being fired. Given the significance of the smoking gun document, it is being quoted herein in its entirety:

From:  blancarddgi@aol.com
Sent:    Saturday, October 11, 2008, 2:16 PM
To:        Haygo Demir; "Rachel D."
Subject:        Eunice

Dear All:

        I spoke to Eunice I gave her the Bad news .... I told her was because of "downsizing" and that her last day will be on Nov 30th.  In PR, the Labor Laws are more strict than in some states from US.  For example her Job and salary can't be touch for a year after a pregnant employee come back to work.  I don't know if she knows this but that is the reason I used downsizing.  We can't hired any new employee for the time being to replace her to avoid any legal issues but we cant pass the job to a new employee but we can to a current employee and myself.

        So to keep everything clear and cover us legally:

        By her last day and next paycheck     we need to pay her:

         Bonus, expenses and vacations left.

        She will be sending us all her expenses which she haven't submitt bc she knew we were in a bad situation.

        Next week she has meeting in JC Penney and the week after Ali from Ritmo will be visiting PR.  She will send me a report of everything she is doing it before she is done with Dgi.

        I already spoke to Ilianny and told her briefly about the situation and that starting Dec. 1st the territory of P.R. Will be hers and I will keep working hand to hand with her.

        Dominican Republic, will be Chancel's and I will be helping her too.

        So, I guess u will be able to announce it on the sales meeting, even that Eunice have no idea that we have it.

        Anything else please let me know

        Thanks

        Blanquita

The fact that neither "downsizing" nor plaintiff's purportedly poor performance was the real reason for the discharge is vividly demonstrated by this document, in which Ms. Rodriguez states that she told Ms. Arroyo that the reason was "downsizing" with *quotation marks in the original,* implying that this was a mere excuse. That the real reason was plaintiff's pregnancy and maternal duties is demonstrated by Ms. Rodriguez's reference to the strict nature of Puerto Rico labor laws with respect to terminations of *"a pregnant employee com[ing] back to work,"* and her further assertion that this is why she "used downsizing" as a reason.

To further cover the company with respect to an anticipated discrimination claim, Ms. Rodriguez advised Mr. Demir that the company could not *"hire any new employee for the time being to replace her to avoid any legal issues,"* although she offered her opinion that on the other hand, to "cover" the company legally, a "current employee" could be employed to take over Ms. Arroyo's responsibilities.

This is exactly what happened immediately after plaintiff left DGI. Sabrina Bandeaux, a DGI employee, was moved to occupy the sixth Territory Manager slot previously occupied by plaintiff Eunice Arroyo.

**5. Retaliatory acts on the part of Demir and DGI**

The retaliation against Ms. Arroyo started as soon as she asserted her right to payment during her maternity leave. As noted above, less than two weeks later, her territory was reduced. Thereafter, she was not allowed to travel on behalf of DGI. About a month or a month and a half later, the decision was made to fire her.

After plaintiff was dismissed, she continued to receive unfair treatment on the part of DGI,

in open retaliation for having asserted her rights before the federal and Puerto Rico administrative agencies charged with handling discrimination cases.

It took the better part of a year after plaintiff's discharge for the company to pay her the remaining portion of her 2007 bonus (and then, only after intervention by attorneys).  DGI also refused to pay Ms. Arroyo any bonus for her extensive work during 2008, claiming, falsely, that the bonus program had been eliminated (a fact which is not documented in any communication to the affected employees, and which is contradicted by contemporaneous documents issued by the company.

Faced with plaintiff's claim that she was entitled to her bonus for 2008, defendants  have come up with the novel notion that the DGI bonus program was "discontinued" in early 2008.  However, during the year 2008, Mr. Demir wrote that a bonus program would remain in effect.  Blanca Rodriguez also admitted this in her "smoking gun" email mentioned above, in which her play book for firing Ms. Arroyo included a provision that she be paid her bonus and vacation pay.

When plaintiff requested him to pay her this *earned* compensation, Mr. Demir informed Ms. Arroyo in December of 2008 that he could not yet give her the bonus, because as in any year, the 2008 bonuses would be calculated during the month of April.  She was told that she would be paid her earned bonus in early 2009.  To date, she has received no such bonus.  Nor has the company ever paid her anything for vacation pay it admits it owed her (although it conditioned payment on the withdrawal of her legal claim and in exchange for receiving less than the statutorily mandated amount pursuant to Law 80.

Although DGI eventually paid plaintiff her 2008 Christmas bonus (upon intervention by plaintiff's attorneys), the company withheld the Christmas bonus until well into the year 2009, and

the check came without the statutory penalty payment for late payment.  To date, the company has not paid the penalty.

After plaintiff asserted her claim of discrimination, Mr. Demir conditioned receipt of these items of compensation, stating that he would pay plaintiff what she was owed only if she would sign a Separation Agreement, which would have meant that she would have waived her right to pursue her complaint.  DGI illegally conditioned the payment of vacation pay on the withdrawal of the complaint.  This was set forth in two letters by Mr. Demir in December of 2008 and January of 2009. In the first, Mr. Demir conditioned the receipt of plaintiff's bonus for the previous year (2007) and the liquidation of her vacation pay on the return of certain DGI property and also on "written confirmation that the legal action you have started against DGI has been cancelled."  In the second letter,  Mr. Demir again conditioned the receipt of these items on plaintiff's signing to a Settlement and Release Agreement which would imply the withdrawal of her legal action.

Once plaintiff asserted her rights, the company also filed a baseless lawsuit against Ms. Arroyo, with Haygo Demir falsely claiming under oath that Ms. Arroyo had traveled to Florida in the context of her work at DGI.   Plaintiff had to incur in tens of thousands of dollars in legal fees with respect to a lawsuit based on untruthful sworn declarations by Mr. Demir respecting the return of largely useless jewelry belonging to DGI, which plaintiff's counsel informed DGI's attorney, was being held in a safe place, in order to off-set the significantly greater amounts which DGI and Demir owe to plaintiff.

The total bill for legal services and expenses in the Florida lawsuit is $39,247.71.  Due to the frivolousness of the case and the lack of personal jurisdiction over plaintiff, DGI has been required to pay $16,000 of this amount.  DGI, however, has appealed this adverse determination.

Thereafter, in the industry, plaintiff became aware that Mr. Demir was saying that plaintiff was a gold-digger who was trying to do harm to the company, that she was terminated due to her poor performance, that her claim was totally false and that it would have a negative effect on the rest of the employees of the company.

### 6. **Damages**

As a result of plaintiff's termination from her job, she suffered grave damages, both emotionally and physically, and in financial terms.

Although plaintiff immediately found a job upon being dismissed from DGI, that job lasted only about three months, because the company was sold. During those three months, she was paid considerably less than she would have received at DGI, suffering a loss of income of approximately $5,000 for those three months.

After that, plaintiff was unemployed for approximately one year, although she took on odd jobs, doing anything to earn money, including driving a golf cart on occasions, selling clothes or food and doing domestic work. She lost somewhere in the order of $39,000 during the year 2009, in comparison to what she would have received at DGI (a conservative amount, since it does not account for raises at DGI), and suffered an additional loss of approximately $10,000 in the first months of 2010, until she finally obtained suitable alternative employment.

Since March of 2010, plaintiff has been employed with Pandora Jewelry. Her salary and bonuses are still some $15,000 less than what she would have earned at DGI. This amounts to an additional $10,000 loss for the remainder of 2010, and approximately 15,000 through the end of trial in December of 2011.

The total income loss for back pay, therefore, is approximately $79,000 to date, (which pursuant to Puerto Rico law, is subject to automatic statutory doubling.

Plaintiff is also entitled to several years of front pay, to put her on a par with the income level she would have attained at DGI.  If three additional years is used, at a differential of $15,000.00, at today's present value rates (and at the high discount rate of 6%), this would imply an additional amount of $ 40,250, also subject to doubling pursuant to Puerto Rico law.

Plaintiff also performed substantial work during her maternity leave.  Using the conservative estimate of 5 hours per week, she is entitled to an additional payment equivalent of one week's worth of work.  Taking her 2008 base salary of $55,000.00 (without considering any bonus), this amounts to $1,057.69 in pay.

The defendants also owe plaintiff other items of compensation related to her work at DGI, as follows: the statutory penalty for late payment of the Christmas bonus, and applicable interest; the sales bonus she should have earned for her work in 2008; the liquidation of some 30 days of vacation pay, and applicable statutory penalties.  It is estimated that these additional amounts are in the order of $12,000, all of which, with the exception of statutory penalties and interests should be doubled under Puerto Rico law.

Plaintiff suffered other items of economic loss.  Her credit was damaged upon the loss of the total salary for the primary wage-earner in her household. She almost lost her home to foreclosure. In the face of this situation, she and her husband had to move from their home, which cost approximately $2,000. The family's cars had to be sold, they cashed in their IRA's and cancelled their life insurance policies.  They sold beloved furnishings and artworks as well in order to survive. She also had to buy some medications for the health effects she suffered, borrowing money from her

24

mother to cover the costs, or foregoing needed procedures. Ms. Arroyo could not pay for a medical plan. The dollar value of these losses (or the loss of opportunity thereon) is estimated at $10,000. Since they are a direct consequence of plaintiff's discriminatory termination, they are also subject to statutory doubling.

In order to live, plaintiff had to request loans from her family and currently owes significant amounts to family members.

Plaintiff is also entitled to punitive damages of $50,000 under Title VII, since DGI has between 15 and 50 employees.

In the event that the discharge is found to be unjust, but not discriminatory, plaintiff would nonetheless be entitled to statutory separation pay, according to a strict formula based on highest compensation and years of service — in Ms. Arroyo's case, amounting to two months of total compensation plus three additional weeks.

If the Law 80 statutory separation pay is to be calculated, it would be based on 2007, the year of plaintiff's highest earnings at DGI, when she had a salary of $55,000 and a bonus of $7,216.59, for a total of $62,816.59, or $1,208.00 weekly and $5,234.72 monthly. Her Law 80 compensation would be $14,093.44.

The strictly financial damages are estimated as follows:

| | | |
|---|---|---|
| $ | 79,000 | Back pay |
| $ | 40,250 | Front pay |
| $ | 1,058 | Payment for work during maternity leave |
| $ | 450 | Penalty for Xmas bonus |
| $ | 12,000 | Other work-related compensation |
| $ | 10,000 | Miscellaneous financial loss |

Sub-total:      $ 142,758

| | |
|---|---|
| Economic compensation: | $ 142,758 |
| Statutory doubling: | $ 142,758 |
| Punitive Damages: | $  50,000 |
| Legal fees for Florida case; | $  39,248 |
| | |
| TOTAL: | $ 374,764 |

This total does not include costs and attorneys fees in the case at bar, or any applicable interests.

In addition to the financial losses set forth above, plaintiff also suffered significant emotional damage and corporal manifestations thereof.  Her family life was totally disrupted, causing difficulties in her relationship with her husband.  The stress was enormous.  She felt totally abandoned and extreme deception at the treatment she had received from a company to which she had dedicated so much time and effort and for which she  was very proud of her work.

At the beginning, Ms. Arroyo lost a significant amount of weight and was exhibiting other manifestations of stress, as well as depressive symptoms.  She even started having blood in her stool, which was related to the stress she was experiencing.  She became very teary and would cry frequently.  She occasionally experiences these symptoms to this day, especially when engaged in litigation-related matters.  Her relationship with her children was affected, due in large part to the plaintiff's stress at not having the funds to care for them and the disruptions caused by the move out of the only house her young son had known and other events caused by the economic instability.  Plaintiff had difficult sleeping.  She felt depressed and would become irritable.   She suffered a significant loss of hair.  She suffered and continue to suffer back pain, all of which are related to the stress.  She continues to be nervous and hyper-vigilant and fearful of the future.  Her social life was affected both by her mood and by her financial situation.  It has been difficult for her to get up the

26

energy to do what she has to do.

Plaintiff sought out medical treatment for these ailments, seeking the help of general physicians with respect to her sleep disturbance, depressive issues and similar complaints. She also sought out the assistance of a gastroenterologist. Although she was referred for certain further-up examinations, she was unable to complete them, due to the costs involved and the loss of her medical plan.

The move out of plaintiff's home was very stressful. Besides the fact that the family had purchased the property with great illusions and hopes, Ms. Arroyo had to deal with the meaning of the move to her whole family and specifically to the children. All of this causes caused an extraordinary amount of stress and a sense of desperation, much of which is reflected in the somatization mentioned above.

### B. Defendants

### 1.        Introduction

Defendants vehemently dispute the statements made in Plaintiff's statement of the case and affirmatively state that DGI and Mr. Demir did not discriminate against Ms. Arroyo in any fashion. In 2008, DGI was encountering severe financial problems that nearly resulted in Mr. Demir's closing the business. Instead, he decided to keep his business running, but needed to find ways to do so. In his efforts to keep the DGI business afloat, he borrowed hundreds of thousands of dollars and sought numerous cost savings measures within his business. One of these cost savings which resulted in a savings of hundreds of thousands of dollars, was downsizing. He terminated numerous employees in 2008 and 2009, including, unfortunately Ms. Arroyo. Mr. Demir does not take

termination lightly and has a history of being overly kind to employees and giving even his poorest employees second and third chances.  In the Fall of 2008, when Mr. Demir realized that he would have to terminate several employees to keep his company afloat (he was already late making payroll on several occasions), he chose employees who were not vital to the survival of DGI.  Ms. Arroyo was one of them.  Mr. Demir, decided not to pour gasoline on the fire and did not tell these employees that they were not vital employees or that the employees who remained with the company were better employees than they were.  Instead, they were (truthfully) told that the termination was a result of downsizing.  Mr. Demir should not be faulted by refusing to pour salt on the open wound.

At any rate, Ms. Arroyo's termination was proper for several reasons.  The company was substantially downsized and she was terminated for that reason.  She also could have been terminated for cause as discussed herein.  Finally, she was the  least profitable and valuable of the territory managers who were employed at DGI at the time of the downsizing.


2.        DGI's Business

Defendant DGI is a sales agency that represents numerous luxury jewelry and watch brands in certain markets of the Caribbean. DGI's office is in Miami Beach, Florida.  A separate legal entity, also called Demir Group International, Inc., is also owned by Haygo Demir and has its sole office in Toronto, Canada.  Plaintiff has sued the DGI entity in Florida.  DGI does not have an office in Puerto Rico or anywhere in the Caribbean.

While DGI sells product in Puerto Rico, sales in Puerto Rico consists of less than five percent of its revenue. As a sales agency, DGI's employees solicit their customers, generally retail stores, and take orders from these retailers on behalf of the brands DGI represents. DGI sends the orders to

28

the brands it represents, which then ships its product directly to the retailer/client. The jewelry never passes through DGI, nor does the money paid by the retailers. DGI is then paid a commission for sales from the vendors it represents, generally eight to ten percent for sold, delivered and paid for product.

To achieve these sales, DGI hires territory managers (or sales representatives) to travel throughout the Caribbean to procure orders from retailers/clients. These orders are then sent to DGI's office in Miami. These territory managers are assigned a fixed territory. Their responsibilities are far reaching, including setting up the brands that DGI represents for distribution in the marketplace, training sales associates, making sure the brand image is up to date and presented in the best condition, presenting sales forecasts in their territories, writing new orders, analyzing inventory, communicating between colleagues, brands and customers, reporting sales and market conditions, making sure orders are shipped timely, visiting retailers on regular basis, and calling clients on a daily or weekly basis. This is what was expected of a successful territory manager, and obviously successful communication is the central component.

### 3. DGI Hires Arroyo

On August 1, 2005, at a time when DGI's business was booming, DGI hired Arroyo, pursuant to a verbal employment contract, as a territory assistant for Puerto Rico, St. Thomas, St. Maarten, St. Barths, St. John, St. Croix, and Tortola. DGI hired Arroyo, knowing that she had no experience in the industry. At that time, she was an assistant to Ilianny Mera, who was the territory manager for that territory. When Arroyo was hired she was the mother of a three-month old child and DGI was well aware of this fact.

### 4. Financial Hardship and Slowed Economy Forces DGI to Terminate  Employees, Cut Pay, and Borrow Money

In 2008, DGI suffered financial hardship as a result of the sluggish economy and worldwide recession.  DGI's gross income significantly decreased.  Arroyo's sales in her territory were down 49% in 2008 and total sales in her territory were down 35%.   Arroyo recognized that the recession was causing customers not to buy luxury jewelry.

In 2008, in an effort to keep the company running and pay DGI's employees, Demir did not take dividends and bonuses from DGI as he did in prior years.  DGI was also forced to borrow a substantial amount of money from Demir's colleagues in the jewelry industry which it still has not paid back entirely.

Unfortunately, as shown herein, even with the loans and additional money that Demir infused into DGI, Demir realized that DGI could not continue to afford to pay all of its employees in light of the significant loss of income that was occurring. As a result, Demir was forced to make the unfortunate decision to dramatically reduce its workforce.  DGI terminated employees throughout 2008 and early 2009, including several terminations or resignations relating to pay cuts that occurred within months of Arroyo's October 2008 termination.[1]   Several employees were terminated or resigned within a couple of months of Ms. Arroyo's termination. Many of these employees who lost their jobs were terminated prior to Arroyo and some had a substantial amount of experience in the jewelry industry.

---

[1]Arroyo quickly found new employment.  On November 4, 2008, Arroyo e-mailed a formal resignation to DGI, and informed DGI that she had found alternate employment and would be resigning her position on November 5, 2008.

The financial struggles that DGI was enduring were evident to all of its employees (apparently except Arroyo who claimed that she did not believe the other terminations were due to financial hardship).  Current and former employees testified that they were well aware that DGI was suffering financially in 2008. Demir curtailed traveling of its salespeople and required that all travel be pre-approved by him personally.  On several occasions in 2008, DGI was unable to make payroll on a timely basis.  Arroyo even complained that DGI did not pay her timely.  DGI's Canadian bank accounts were frozen on two separate occasions due to DGI's inability to timely pay its Canadian taxes.

DGI's tax returns clearly show the financial struggles that the company was enduring in 2007, through 2008 and 2009 (subsequent to Arroyo's termination) DGI was in serious financial trouble. The chart below demonstrates DGI's (Canada and United States combined) profit and salaries & commissions history from 2006 to 2008:[2]

| Year (FN3) | Combined Net Income | Combined Salaries & Commissions (FN4) |
|---|---|---|
| 2006 | $24,890 | $1,145,244 |
| 2007 | -$15,419 (loss) | $1,118,686 |
| 2008 | -$505,421 (loss) | $902,881 |
| 2009 | $82,931 | $525,249 |

As the tax returns show, even though DGI significantly cut its salaries in 2008 (by twenty percent),

---

[2] These numbers are taken from DGI's United States and Canadian tax returns.

3 DGI recognizes that DGICanada'S tax returns are for its fiscal year of November 1 through October 31.  DGI also did not convert Canadian dollars into United States dollars. Nonetheless, the trend of net losses and reduction in salary is certainly clear.

4 While DGI did not pay commissions to its employees, some payments to Haygo Demir, Ilianny Mera (an indepednet contractor) and some others were categorized as "commissions" for income tax purposes.

its losses in 2008 were tremendous for a business of its small size (and does not even take into effect the money that DGI borrowed and still owes). Had DGI not downsized these employees, the result would have been even more disastrous. DGI's salaries and commissions decreased significantly between 2008 and 2009 by another $377,632, which represents 42% of the previous year's salaries. This decrease in salaries was particularly recognized in 2009 as much of the downsizing occurred in late 2008. DGI's downsizing allowed DGI to eliminate nearly $600,000 in yearly salaries over these two years, likely permitting the company to survive this crisis. If these salaries hadn't been cut, the result would have been the closing of the business or bankruptcy.

### 3.   **Arroyo was Promoted to a Territory Manager**

In February 2007, DGI promoted Arroyo to Territory Manager. Arroyo maintained this position at DGI for twenty months, until her October 2008 termination. Arroyo's territory initially was Puerto Rico and the Dominican Republic, and later was expanded to also include Barbados, St. Lucia, Antigua, Dominica, and Trinidad.

#### i.   *Arroyo's Sales Were Extremely Low*

Unfortunately, Arroyo's performance as a territory manager was not at the level of her performance as a territory assistant. Arroyo produced the least amount of sales of all territory managers in both of the years she held that position. She also had the worst ratio of sales in her territory vs. sales in her territory that others were responsible for (she only accounted for 25% of the sales *in her territories* in 2007 and 20% in 2008). The charts below demonstrate DGI's sales breakdown by territory manager for 2007 and 2008:





During each of these years, Arroyo only contributed an extremely small percentage of DGI's total sales.

### ii.    *Arroyo Failed to Effectively Communicate with her DGI Colleagues*

Perhaps most critical to Arroyo's failures is her refusal to communicate with her colleagues at DGI and with her customers in her territories.  Haygo Demir (DGI's President), Krystal (Williams) Sweeney (Arroyo's supervisor during part of her term as territory manager), and Chantel Romeu (Arroyo's territory assistant) all testified that Arroyo had serious communication difficulties.  Arroyo rarely communicated with her DGI co-workers, and as a result, they did not know whether she was working, and if she was, what she was doing, where she was traveling, who she was meeting with, and any successes, difficulties or failures that she was encountering in the marketplace.  At her December 21, 2010 deposition, Arroyo admits that she did not often communicate with her co-workers.

Arroyo's supervisor, Krystal (Williams) Sweeney struggled with Arroyo's lack of communication. Arroyo was non-responsive and failed to return phone calls. Sweeney made pleas with Arroyo to more effectively communicate with her, as her supervisor.  Ms. Sweeney also supervised Ilianny Mera.  While Ms. Mera communicated with Sweeney three to four times daily, Sweeney heard from Arroyo approximately one time per week.  Arroyo admitted that Sweeny required the same communication from Arroyo as she did from Mera.

Arroyo's performance and communication skills were so poor that Ms. Sweeney suggested that Demir terminate Arroyo's employment months before her actual termination. Instead, Demir gave Arroyo another opportunity and transferred Arroyo to Blanca Rodriguez' supervision. Even Demir himself had difficulty obtaining information from Arroyo regarding her work.  In March 2008, Demir sent Arroyo an email indicating that she needed to "tell us [DGI] everything you do so we are aware of all the activities in your markets."

34

Arroyo also failed to communicate with her territory assistant, Chantel Romeu. Ms. Romeu was both Arroyo and Ilianny Mera's assistant. Ms. Mera communicated with Ms. Romeu on average ten times per day, while Ms. Romeu was lucky to receive a phone call or email from Arroyo each month (not including order processing).

### iii.    Arroyo Failed to Effectively Communicate with her Customers

Arroyo admits that there were areas in her territory that she had never even visited. She testified that while she remembers Mr. Demir stressing the importance of developing relationships with shopping guides, who were individuals who brought cruise ship passengers and other tourists to the stores on various islands, she made no effort to develop these relationships. Indeed, she did not initiate even one meeting with a shopping guide. She admitted that she took minimal trips to the islands in her territory, other than Puerto Rico, with the intention of visiting her customers and observing the store (which she admitted was a critical part of her job as territory manager), and never any of her customers in Antigua (with the exception of Diamonds International, which was not her account) or Dominica, and visited only 2-3 stores in Barbados, Dominican Republic, and St. Lucia. She could not remember the names or owners of the majority of her customers. Perhaps most disappointing, she testified that when she received order reports from DGI showing sales made by each of the territory managers in their respective territories, what product was sold, and which customers purchased, she rarely reviewed them, and when she did, only looked at information from her own territory. This shows that Arroyo had little interest in the company as a whole and was not a team player. Customers in Arroyo's territory - - Arroyo's own clients - - did not know who she was. Also, there were times that DGI did not know where Arroyo was and she even canceled

35

appointments without notifying the client.  In addition to her communication issues, Arroyo failed to learn her industry and clients.

### 6. Arroyo's Employment at DGI is Terminated

DGI's workforce was downsized (DGI Canada and Florida combined) from eighteen in January 2008 to eight by the end of March 31, 2009 (not including its owner). By the beginning of 2009, DGI could only afford to retain the employment of essential employees.  Arroyo was not one of these essential employees and was one of many employment casualties.

DGI and Demir took the decision of terminating employees very seriously. The first group of employees who were terminated were "luxury" employees. Such employees included personal assistants and sales analysts.  These employees were hired during the company's successful years and while they added a benefit, they were not essential and necessary employees when DGI was looking for ways to cut costs.

Unfortunately the savings from these initial terminations was not sufficient and DGI was required to continue downsizing.  In the Fall of 2008, Demir met with two of his managerial level employees, Rachel Doherty and Blanca Rodriguez, to discuss the company's financial pressures and determine the next step to relieve some of the company's costs and ensure its survival. Two options were discussed: (1) additional terminations and (2) additional pay cuts. Demir, Ms. Doherty and Ms. Rodriguez collectively determined that DGI would terminate Arroyo's employment (as well as others).[5]  DGI decided to terminate Arroyo, as opposed to Ms. Mera or others at DGI because of

---

[5] Pay cuts for some employees had already occurred.  For instance, Krystal Sweeney's pay was cut by $15,000.   Moreover, Lindy Nanni resigned because her salary was reduced.

Arroyo's substandard performance and specifically her failure to develop relationships with clients, failure to adequately communicate with others within DGI and failure to cause a significant amount of sales in her territory. Simply put, she became a luxury employee as she was not a team player and was not as effective of a territory manager as her colleagues. Even Arroyo admitted that Mera and Rodriguez completed more sales, and therefore more money, for DGI.

While Arroyo's performance left a lot to be desired, her termination was not the specific result of her performance, but instead was directly because of DGI's severe financial hardship and the resulting need to restructure the company to ensure its survival. DGI's management determined that, at that time, Arroyo (as well as others who were simultaneously downsized) were non-essential employees of the company and were employees whose downsizing would not cause an adverse effect to the future of the business. They also realized that it would not be a significant hardship to have other DGI employees cover Arroyo's territory.

Ms. Rodriguez agreed to the decision to terminate Arroyo and actually volunteered and then insisted on being the one to call Arroyo to inform her of the termination. On October 10, 2008, approximately three months after Arroyo returned from maternity leave, Rodriguez notified Arroyo that DGI had no choice but to terminate her employment, effective November 30, 2008. There was never any ambiguity regarding the reason for Arroyo's termination. DGI, at all times, explained to Arroyo that the termination was based on economic considerations, and despite her denial, Arroyo was well aware of DGI's financial struggles, its inability to timely make payroll and of the difficulties of selling jewelry during the economic recession.

After Arroyo's termination, DGI transferred the Puerto Rico territory to Ilianny Mera, who was a better team player and more experienced and effective salesperson than Arroyo. In 2007, Mera

had $3,079,226.79 in sales, as compared to Arroyo's sales of $652,390.82.  In 2008, Mera's $2,630,422.30 of sales far exceeded Arroyo's $335,363.42 of sales.  Of course, Arroyo has admitted that Mera trained her when she was Mera's territory assistant.  Mera taught Arroyo everything she knew about jewelry industry.

To be crystal clear, the reasons stated above were the whole reason for Arroyo's termination. Her termination had nothing to do with her previous pregnancy, her gender, or the fact that she had two children. In fact, Arroyo herself admits that she has no idea why she was fired. Therefore, Arroyo's harassing, ludicrous and damaging allegations cannot be further from the truth and simply an attempt to have the Defendants pay her money she has not earned at a time when Defendants continue to endure severe financial problems.

3.  **EACH PARTY'S CONTENTIONS WITH RESPECT TO CONTROVERTED MATERIAL FACTS, CONTESTED ISSUES OF LAW, EVIDENTIARY QUESTIONS, AND SUPPORTING AUTHORITY**

A. **Plaintiff**

Plaintiff requests the court to take note of the following factual controversies, legal disputes and evidentiary questions.  Where appropriate, authority is given with respect to plaintiff's arguments.

i. **Factual Controversies**

Plaintiff has identified the following controversies which are clearly factual in nature:

a. **Whether DGI eliminated its bonus program in 2008**

Defendants contend that the DGI bonus program was eliminated in 2008, and that plaintiff,

therefore, had no right to receive any bonus on her sales during that year.   Faced with plaintiff's claim that she was entitled to her bonus for 2008, defendants  have come up with the novel notion that the DGI bonus program was "discontinued" in early 2008.

Plaintiff disputes this with documentary evidence from the company itself, including written statements by Mr. Demir both at the beginning of 2008 and in late 2008 and early 2009, after plaintiff filed her claim.   Plaintiff also points to the "smoking gun" email, in which DGI official Blanca Rodríguez lays out a game plan for plaintiff's discharge, including paying her the bonus to which she was entitled.

b. **Whether DGI failed to pay plaintiff her earned vacation pay**: Company documents show that plaintiff was entitled to $1,742.73 in vacation pay at the time of her discharge. Plaintiff contends that she is entitled to considerably more.

c. **DGI in 2008 - did economic problems cause plaintiff's discharge?**  Defendants contend that DGI was suffering economic problems in 2008.  While plaintiff does not dispute that there was a dip in revenues, she maintains that the claim of economic problems was a smokescreen for discrimination, *first*, because Mr. Demir used his various corporations and enterprises as a piggy-bank, shifting funds from one to another and thereby making it impossible to discern DGI's true economic situations, and *second*, because there was still a need to have a Territory Manager to perform the functions performed by Eunice Arroyo, at a time when two employees were promoted to that position and yet a third was given a $20,000 raise.

39

**d. Whether plaintiff's action in retaining control over jewelry was justified**: Defendants have asserted that plaintiff owes over $30,000 to DGI for her retention of jewelry belonging to the company.  Plaintiff maintains that her action was justified.

At the outset, it should be noted that DGI's claim for return of the jewelry was made in the context of its retaliatory action in demanding that plaintiff withdraw her legal claim and return the jewelry, as a *condition* for receipt of her *earned* vacation pay and for payment of a bonus which was long overdue.

In response, plaintiff stated that she was always willing to return the jewelry, but that she would not accept the condition that DGI was imposing.

Thereafter, the defendants, through defense attorney Michael Cotzen, issued a demand letter to plaintiff,  accusing plaintiff of civil theft, seeking damages in excess of $90,000, and saying that her employment case was without merit.

Plaintiff's counsel responded by noting the pendency of her employment discrimination claim, the value of which far exceeds any value of the retained jewelry.  Nonetheless, plaintiff offered to place the jewelry in escrow pending the resolution of this lawsuit.  Plaintiff's attorneys also requested that the defendants take reciprocal action to assure any judgment plaintiff might obtain against them.  Plaintiff's attorneys also indicated to defense counsel that they were open to further discussions regarding this matter.

Defendants' response was a frivolous lawsuit, filed in Florida, in a court which had no jurisdiction over plaintiff.  Plaintiff had to incur in the expense of securing counsel in Florida, the cost of which has been close to $40,000.  The lawsuit was eventually dismissed, and attorneys fees were imposed on DGI and Demir for filing a lawsuit based on information they knew to be false.

In the meantime, the jewelry has always been kept in a safe place, consistent with plaintiff's position, as expressed in the communications sent to DGI and its attorneys.

**e. The value of the jewelry**:

The value of the jewelry is in dispute.  The defendants have the burden of establishing its value.

**ii. Legal Controversies**

Plaintiff has identified the following controversies in this case, which are purely legal in nature:

**a.  Whether Title VII and Puerto Rico statutes cover discrimination up to and including a termination several months after an employee returns from maternity leave**:

Defendants assert that plaintiff's claim of pregnancy discrimination with respect to her discharge is untenable, because she was not pregnant at the time of her dismissal.  Plaintiff maintains that this is contrary to applicable law and authority.

At the outset, it should be noted that plaintiff's claim of pregnancy discrimination goes well beyon the October, 2008 discharge ---- in addition to her termination, plaintiff challenges the reduction of her territory *during* her maternity leave (and the undue pressure and hostility directed at plaintiff *while* she was pregnant*),* as well as DGI's use of the *lower* sales figures resulting therefrom as *justification* for the subsequent discharge, in conjunction with the argument that plaintiff's sales *during* her leave and due to pregnancy-related illnesses and the inability to attend overseas shows.

41

Even as to the discharge decision, defendants' position is untenable. Title VII's pregnancy protection, approved in 1978 in the Pregnancy Discrimination Act, and the corollary protection under local law apply, even though DGI waited until a month after plaintiff returned from maternity leave to make the decision to terminate her.

The First Circuit has rejected the position advanced by the defendants that plaintiff has no protection because she was not pregnant at the time of discharge. *See, Smith v. F.W.Morse, 76 F.3d 413 (1ˢᵗ Cir., 1996)* (recognizing "an intention to become pregnant" as triggering the protection and considering a discharge after a woman gives birth as also covered.) *See, also, Chadwick, 561 F.3d at 48 (* " a reasonable jury could find that the [adverse employment decision] was more probably than not caused by discrimination.... Given the common stereotype about the job performance of women with children and given the surrounding circumstantial evidence ..... a reasonable jury could find that the [employer] would not have denied a promotion to a similarly qualified man because he had 'too much on his plate' and would be 'overwhelmed' by the new job, given 'the kids' and his [other responsibilities]." *See, also, Santiago-Ramos v. Centennial, 217 F.3d 46, 54 (1ˢᵗ Cir., 2000),* regarding an announced intention to have another child.

Law 3, moreover, contains language which is directly contrary to defendants' stated position. *Subsection (a) of 29 LPRA §469* provides protection against discrimination *in addition to the dismissal* of a woman *"while being pregnant,"* (the only protection which defendants recognize.) The law prohibits the "refus[al] to reinstate [an employee] *after childbirth*..." Clearly, the legislature of Puerto Rico extended protection to working mothers both *during* their pregnancies and *thereafter* from acts stemming from prejudice against such employees.

42

b. **The number of employees — whether Canada counts for Title VII purposes**:

DGI has employees in Florida, Canada and Puerto Rico. Defendants have also *stipulated* that if both companies are considered, DGI had more than the requisite 15 employees for each of twenty weeks during 2007 and 2008. Plaintiff maintains that the employees of the Canada company must be counted for Title VII, a legal point which defendants dispute, but as to which the presiding Magistrate Judge at the time, decided in plaintiff's favor.

Plaintiff contends that Judge Arenas's ruling is correct. Employees in Canada must be counted in a "single employer" situation such as that in the case at bar (two corporations, wholly integrated in operational terms). *See, Kang v. U. Lim. Am.*, *296 F.3d 810 (9ᵗʰ Cir, 2002); Morelli v. Cedel, 141 F.,3d 39 (2ⁿᵈ Cir 1998); Hirsbrunner v. Martínez Ramírez, 438 F.Supp. 2d 429 (D.P.R. 2006); Wildridge v. IER, 65 F.Supp. 2d 419 (N.D.Texas 1999).* Although there is certainly other authority supporting defendants' position, the EEOC Compliance Manual on Threshold Issues, No. 915.003 is consistent with the holding of this court, providing that "in determining whether a U.S. based branch of a foreign employer is covered, employees based abroad should also be counted *if the U.S. and foreign branches constitute an integrated enterprise.* Thus, if a Japanese employer as a U.S. based branch with only 10 employees, it would still be covered by Title VII if the U.s. employer is integrated with a foreign branch with at least five employees." *Sec. 2-III-B-3-c.* This kind of integration is readily apparent with respect to DGI.

c. **Number of employees for Law 80 purposes**: Plaintiff maintains that the same analysis should govern the analysis for Law 80 purposes when considering seniority. This is a single, integrated company, with six Territory Managers. Even if one accepts the notion that one Territory

Manager had to be subject to a reduction in force (which is belied by the fact that there were six employees in this category before plaintiff was terminated and six afterward), the question is: who had the least seniority?

Law 80 requires companies to adhere strictly to the concept of seniority, being "obligated to retain with preference ... those employees with the greatest seniority, as long as there are vacant positions which the employee can perform, or those which are occupied by employees of less seniority in employment, within the same job classification." 29 LPRA §185c (translation provided). The only exception to this rule of seniority retention is extremely limited — when there is a "clear difference" in terms of "efficiency or capacity" of the employee, in which case seniority can be bypassed. *Id.* In effect, the Company must present clear evidence, which demonstrates why the less senior employee was favored.

If these rules are not followed, then the court must determine that there is no "just cause" for the dismissal. This determination has the effect of conclusively deciding against the employer for Law 80 purposes and of activating the *presumption* of discrimination for Law 3, Law 100 and Law 69 purposes. *See, Alvarez-Fonseca v. Pepsi Cola of Puerto Rico, 152 F.3d 17, 27-28 (1st Cir. 1998).*

Plaintiff maintains that she was fourth in seniority of the six Territory Managers, with Chantel Romeu and Tiffany Cox having less seniority than she had. Defendants have posited that seniority should contemplate only Ilianny Mera (who had greater seniority than the plaintiff) and plaintiff, meaning that plaintiff had the least seniority. They reach this conclusion by considering only Puerto Rico based Territory Managers. Plaintiff contests this point, especially in the particular context of DGI, in which Territory Managers do not necessarily live where they sell (eg: Krystal Williams in Canada, covering Alaska; Blanca Rodríguez in Miami, covering Mexico; Chantel

Romeu in Miami, taking over plaintiff's Caribbean territories).

The former presiding Magistrate Judge issued a decision holding that only those Territory Managers who have covered Puerto Rico count when considering the seniority provisions of Law 80. Thus, Judge Arenas counted Ilianny Mera, Eunice Arroyo and Chantel Romeu. This ruling, as to which both parties disagree, albeit for different reasons, clearly establishes that Eunice Arroyo was not the Territory Manager to be terminated, if good cause were to be followed. Despite this, Judge Arenas did not issue Partial Summary Judgment on the Law 80 claim, since he opined that he could not determine on the basis of the papers submitted whether or not Chantel Romeu was so clearly superior to Ms. Arroyo so as to justify altering the seniority rules.

Plaintiff contends that all Territory Managers should have been counted, which would mean that Tiffany Cox also would have been considered. Nonetheless, even with Judge Arenas's ruling, it is evident that the defendants cannot have determined that Chantel Romeu so clearly exceeded Ms. Arroyo in terms of performance so as to favor Ms. Romeu's retention over Ms. Arroyo.

Moreover, to the degree that the defendants have attempted to justify their argument on Ms. Arroyo's purportedly poor performance by using 2008 sales figures, this is in violation of the provisions of Law 3, which prohibit using diminished production during pregnancy and maternity leave as a factor in adverse employment decisions. Once plaintiff became pregnant, DGI limited her travel and did not allow her to go to the Las Vegas show where major sales were made. She was also out on maternity leave for two months in 2008. Defendants cannot show that Chantel Romeu, made a Territory Manager only a month or two before the decision was made to fire plaintiff, was clearly superior to Eunice Arroyo.

45

**d. The appropriate remedy if defendants' prevail on the affirmative defense regarding the jewelry**

Defendants now assert that any award assessed against the defendants would have to be "reduced by the amount of the property plaintiff admits she kept," i.e. the jewelry belonging to DGI. Plaintiff contends that the offset should not be in a monetary amount, but rather should be the return of the jewelry itself, which has been kept in a safe place awaiting the defendants' action on paying Ms. Arroyo the amounts it owes her.  The return, of course, should only be upon the defendants' satisfaction of any judgment plaintiff may obtain against DGI and Mr. Demir.

**iii. Mixed Legal and Factual Controversies**

a. **The single employer issue**:

Early in the litigation, defendants *stipulated* that DGI is a *single* employer for purposes of Title VII (encompassing both the Canadian and the Florida operation of the company.)  "Single employers" are typically integrated enterprises, based on a factorial analysis regarding common management, control over labor relationships, common ownership and overall interrelation. *See, Romano v. UHaul*, 233 F.3d 655, 662 (1st Cir., 2000).  DGI clearly fits the bill, as amply demonstrated in the factual statement set forth above.

It is plaintiff's position that the defendants must be bound by this stipulation.  In the event that defendants question this, however, this would be a mixed legal and factual issue

b. **Whether plaintiff was the victim of pregnancy and gender discrimination:**

Plaintiff contends (and defendants dispute) that she was the victim of pregnancy (and gender)

46

discrimination at DGI, in the reduction of her territories and her eventual dismissal, all of which is prohibited by both federal and Puerto Rico law.  *See, Law 100, Law 69 and Law 3, Law 3 of March 13, 1942, 29 LPRA §469 et seq., as well as Title VII, 42 U.S.C. §2000e et seq.;  See, also,* <u>*Chadwick v. Wellpoint*</u>*, 561 F.3d 38 (1ˢᵗ Cir., 2009)*

    c. **<u>Whether plaintiff has made out a case of retaliation</u>**:  Plaintiff contends that she was subject to retaliation upon her assertion of her rights while still employed at DGI and after she was fired.  She had items of compensation withheld in retaliation from her claim, with the company directly conditioning their payment on her withdrawal of her legal action.  She was also subject to a baseless lawsuit in Florida, where she had not been for decades, based on false sworn statements by Mr. Demir.  All of these acts were in violation of the anti-retaliation provisions of both Title VII and Law 115, as well as Law 69 (gender discrimination, which has a specific protection against retaliation).

    Law 115 and Law 69 are part of the labor law legislation in Puerto Rico which has been construed liberally by the courts in furtherance of its goal to protect employees.  *See,* <u>*Irizarry v. Johnson & Johnson*</u>*, 150 D.P.R. 155 (2000 ), citing* <u>*Mendez Orellana v. Fondo del Seguro del Estado*</u>*, 140 D.P.R. (1996) and* <u>*Santiago v. Kodak Caribbean*</u>*, 129 D.P.R. 763 (1992).*  Law 115 clearly protects against retaliation of this nature.  Ms. Arroyo unquestionably "offered ... verbally [and] in writing ... testimony, expression [and] information before an .... administrative [and] judicial forum in Puerto Rico," and defendants retaliated against her for having done so.

    Plaintiff can also make out a claim of retaliation pursuant to Title VII.  It has long been established that the prohibition against retaliation in employment discrimination cases is extensive

to former employees against whom employers retaliate after their exit from the Company.  In 1996, the Supreme Court, in its unanimous ruling in _Robinson v. Shell Oil, 519 U.S. 337 (1996)_ addressed the _purpose_ of the protection and held that the action by an employer in giving a bad employment reference with respect to a former employee that had complained of discrimination.   Finding that this kind of retaliation is actionable under Title VII, the Court explained that should they reach a different result an employer could continue discriminating against a former employee with impunity, providing immunity with respect to post-termination acts against dismissed employees, and destroying the make-whole purpose of the statute.

   d.  **Whether defendants can demonstrate "just cause" for the employment actions against plaintiff, as set forth in Law 80 and in pari materia in the Puerto Rico laws prohibiting discrimination**:

   Plaintiff asserts that her discharge was unjust (as defined in Law 80) and as considered _in pari materia_ with respect to Law 3, Law 69 and Law 100.  Pursuant to Law 80, defendants have the burden of proof on this issue.

   A determination that there was no just cause for the termination entitles plaintiff to the statutory mesada.  In the context of the anti-discrimination laws, it entitles a plaintiff to a rebuttable presumption of discrimination.

   Defendants will not be able to meet their burdens under Puerto Rico law of demonstrating that they had just cause for the discharge, both with respect to the anti-discrimination statutes) and with respect to the alternative Law 80 claim.  The defendants' only theory is that this was a Reduction in Force.  They advance two alternative arguments: (1) that seniority was followed because Eunice Arroyo should be compared only with the other Puerto Rico employee, Ilianny Mera

48

(an argument discussed above, which they lost before Magistrate Judge Arenas); and (2) that Chantel Romeu (who only started as a Territory Manager *during* plaintiff's maternity leave) was clearly superior to plaintiff, so as to comply with the narrow Law 80 exception.

Plaintiff contends that defendants cannot demonstrate that there was "just cause" for the discharge, as defined in the applicable local law statutes.   First, there was *not*, in fact, a reduction in force, since Sabrina Badeau was made a Territory Manager as soon as plaintiff was fired, meaning that there were six Territory Managers both before and after her discharge.   Even if there *were* a reduction in force, however, Chantel Romeu and Tiffany Cox were both less senior than plaintiff, and the defendants cannot meet their burden of demonstrating their clear superiority over plaintiff.

e. **Whether defendants can demonstrate a legitimate basis for their employment decisions pursuant to federal law.**

Plaintiff's position is that defendants cannot justify DGI's adverse employment actions under federal law, which prohibits gender discrimination and pregnancy discrimination.   As noted above, their explanations are contradictory and unsupported.   Plaintiff contends that the true reason for selecting Eunice Arroyo to be dismissed from the company was due to her pregnancy.

f. **Whether the purported legitimate business reasons are mere pretexts**: Defendants' claim of just cause is mere pretext, given the factual inconsistencies in their ever-changing explanations of their decisions, their mendacity, their lack of proof, and the admission by a company officer that the reason preferred by the defendants at the time of discharge — downsizing — was a brazen excuse. *See, <u>Reeves v. Sanderson</u>, 530 U.S. 133 (2000).* The inference of pretext is bolstered

49

by all of the inconsistencies, lack of logic and prevarications amply discussed in plaintiff's factual section above. Pretext and discrimination can be inferred upon a showing that the employer's proffered "explanation is unworthy of credence" *Id, 530 U.S. at 147,* due to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" *Santiago Ramos, at 56 (internal cites omitted).* As to many of these justifications, moreover, plaintiff will demonstrate that DGI's "nondiscriminatory reasons were after-the-fact justifications" *Id.*

Also relevant to the ultimate issue is proof relating to the discrimination itself, such as discriminatory comments or behavior on the part of decision-makers or a "general atmosphere of discrimination", which "may be considered along with other evidence bearing on motive in deciding whether a Title VII plaintiff has met her burden of showing that the defendants' reasons are pretexts." *Id.,,at 55 (internal cites omitted),* All of these elements are present in the case at bar.

g. **Whether plaintiff made out a tort injury**: Although this injury is subsumed in other claims, plaintiff objects to defendants' contention that she has not sufferent an injury in tort, pursuant to Articles 1801 and 1802 of the Civil Code, Civil Code, 31 L.P.R.A. sec 5141.  There is broad tort liability under Puerto Rico law.  The Supreme Court has characterized the "fault" concept of Article 1802, as "infinitely all-embracing, so comprehensive as the human conduct" that "does not admit of limitations or exceptions of any nature", "of great breadth", "including all type of human transgression, be it in the legal or the moral order".  *Santini v. Serv Air Inc., 137 D.P.R. 1 at 8-9 (1994)* (internal cites omitted and translation supplied).  The concept of fault is as broad as the conduct of human beings and any "fault" which causes or produces damage. *Colon v. Romero*

*Barcelo*, 112 P.R.R. 718 (1982).

Moreover, the right to dignity and privacy under the Puerto Rico Constitution constitutes a constitutional tort under the Puerto Rico Constitution, Art. II secs 1 & 8. This right of privacy/dignity has been amply discussed by the Puerto Rico Supreme Court, which has characterized it as one of "supremacy", of the "highest hierarchy" in the Puerto Rico constitutional order, a "cornerstone" of the legal system, and one which "constitutes a crucial dimension in human rights". *Arroyo v. Rattan Specialties*, 117 P.R.R. 43 (1986); *Garcia Santiago v. Acosta*, 104 D.P.R. 328 (1983); *Figueroa Ferrer v. ELA*, 107 D.P.R. 250 (1978) (translations provided); *Colon v. Romero Barcelo*, op.cit. The Puerto Rico Supreme Court has consistently applied the privacy/dignity to acts committed by private individuals and corporations, including those occurring in the employment context, *See, eg; Arroyo*. Both the First Circuit and this court have fully embraced these doctrines embodying intimacy and privacy rights, as well as protections against abusive attacks to one's personal dignity, integrity, honor and reputation. *See, eg., Negron v. Caleb Brett*, 212 F.3d 666, 670 (1st Cir., 2000) (explaining the application of the Constitutional doctrine in a setting in which a person would have to choose between his/her job and the "code of ethics and the law"); *Robles-Vazquez v. Tirado Garcia*, 110 F.3d 204, 207-209 (1st Cir., 1997) (acknowledging "privileged place" of these rights); *Kerr-Selgas v. American Airlines*, 69 F.3d 1205, 1213 (1st Cir., 1995) (recognizing their "great importance" under Puerto Rico law); *Rivera-Flores v. PRTC*, 64 F.3d 742, at fn 9 (1st Cir, 1995); *Machin v. Leo Burnett*, 376 F.Supp. 2d 188 (D.Puerto Rico, 2005); *Solla-Figueroa v. Mendez & Co.* 2006 U.S. Dist. LEXIS 52631 (D. P.R., 2006).  Moreover, in the context of labor disputes, when independent torts of constitutional breadth coincide with adverse employment actions, it is uncontested that an independent cause of action exists against the employer and/or its supervisors,

51

directors, or other agents or representatives.  *Arroyo, supra; Segarra Hernandez v. Royal Bank*, 145

*D.P.R. 178 (1998); Kerr-Selgas  Machin; Solla-Figueroa.*

The situation faced by plaintiff Eunice Arroyo at the workplace was an assault on her dignity

and the honor of her family.  She has been subject to false accusations and has been attacked for the

mere fact that she wanted to expand her family.  Puerto Rico tort law is certainly sufficiently broad

to address conduct of this nature.

### h. **Mitigation**

Defendants have raised the affirmative defense of "failure to mitigate," asserting that Ms.

Arroyo's damages should be "barred" or reduced due to her "failure to mitigate."  While plaintiff

agrees that there should be a reduction of any damage award to account for amounts she has actually

earned after she was dismissed from DGI, she strenuously objects to any notion that she "failed to

mitigate."  Plaintiff submits that this issue should not even be submitted to the jury.

It is clear that defendants have the burden of proof on this issue. *See, Carey v. Mt. Desert*

*Island Hosp.*, 156 F.3d 31, 41 (1ˢᵗ Cir., 1998).  The defendants must demonstrate that plaintiff's

efforts to mitigate were not "reasonable." *See, Jackson v. Shell Oil Co., 702 F.2d 197, 202 (9th Cir*

*1983). See, also Lavely v. Trustees of Boston University, 1986 U.S. Dist. LEXIS 8582 (D. Mass*

*1987).*  To fulfill its burden, a "defendant must show more than that there were further actions that

plaitniff could have taken in pursuit of employment.  Rather, the defendant must show that the courts

of conduct plaintiff actually followed was *so deficient* as to constitute an *unreasonable failure to*

*seek employment.*" *Thurber v. Jack Reilly's, 521 F.Supp. 238 (D. Mass, 1981).*

In the case at bar, defendants have absolutely no evidence which would permit a jury to

conclude that plaintiff's efforts were deficient or unreasonable.  All defendants have stated is that

plaintiff turned down one job offer made to her immediately after she was fired, and which would have paid her a fraction of what she earned at DGI, for work not commensurate with her abilities and experience.  Clearly, the particular job was "not substantially equivalent to the job" at DGI. *Jackson, 702 F.2d at 197.*

In reality, Ms. Arroyo's efforts to find suitable alternative employment were extraordinary. She sent out dozens of resumes.  She actually found employment almost immediately, but then she was laid off.  She engaged in odd jobs to make ends meet.  And, finally, after a year and a half, found the job she has today, although she still earns less than she would have had she remained at DGI.

The affirmative defense of "failure to mitigate" as "bar"to recovery should not be sumitted to the jury.

### iv. Evidentiary Issues

#### a. Admissibility of post hoc litigation summaries and pie charts

At this juncture, the only major evidentiary issue anticipated by the plaintiff concerns the admissibility of pie charts and financial analysis documents, which were prepared exclusively for litigation purposes.  These documents were not taken into account when the adverse employment decisions were made.  They were post-hoc justifications for employment decisions taken years ago, created after the litigation commenced, and for the purpose of proving defendants' case at trial.

Plaintiff objects to the presentation in evidence of any documents (including charts) which were prepared by DGI subsequent to the filing of this action, for the express purpose of attempting to demonstrate the purportedly poor quality of plaintiff's work.  Such documents are not relevant; they are based on improper hearsay; they were not prepared in the ordinary course of business; and

they are not admissible under any other theory.  Any analysis of sales numbers based on post-hoc litigation-created documents is fatally flawed and should not be presented to the jury, which rather, should look to the bonus calculations *made by the company* during Ms. Arroyo's employment, which show her within a few hundred dollars of the *top* producer for the company of those entitled to bonus, and *second* of the four employees entitled to bonuses.

    b. **Defendants' objections to plaintiff's job-search documents:** Plaintiff sent out dozens of emails seeking employment, accompanied by resumes in many cases.  Defendant, however, objects to presenting these documents unless the actual resume is attached, on grounds of "completeness."  Plaintiff contends that there is no rational theory which would have plaintiff trying to torpedo her own job search by sending out a deficient resume.  For her to now go back and locate each resume sent with each inquiry would be extremely onerous and not productive in any way.

    Plaintiff notes that this issue was already addressed by this court when it denied on a Motion to Compel with respect to the production of the resume.  *See, Docket #44 (Motion to Compel); Docket #45 (opposition to motion) and Order at Docket #123.*  In any event, the failure to include the actual resume with respect to the dozens of emails sent is properly not a question of admissiblity, but rather one which defendants can address in cross examination.

  **B. Defendants**

  **i. Factual Controversies**

    There are many factual controversies in this case that the parties have not briefed at length herein.  The parties have identified the some controversies which are clearly factual in nature:

a. **Whether DGI eliminated its bonus program in 2008**

Defendants contend that the DGI bonus program was eliminated in 2008, and that Plaintiff, therefore, had no right to receive any bonus on her sales during that year.   Defendants cite to the testimony of Mr. Demir and various DGI employees who have testified that there was no bonus program in 2008 as DGI eliminated it as part of its method in dealing with the financial crisis that it was encountering.

b. **Whether DGI failed to pay plaintiff her earned vacation pay**: Defendants contend that all vacation pay has been paid to the Plaintiff.

c. **Whether DGI was suffering economic problems in 2008**

Defendants contend that DGI was encountering severe economic problems in 2008 that required it to borrow a considerable amount of money, cut costs, and terminate the employment of various employees.  DGI contends that this economic difficulty was part of the reason that Ms. Arroyo's employment was terminated.  DGI believes that this is demonstrated by its tax returns, its termination of other employees, its reduction of expenses, its inability to make payments as they became due, its borrowing money from third parties, its loss in revenue, and the worldwide economic crisis.

d.    **The Level of Arroyo's Arroyo's Work Performance In Relation to Other Territory Managers**

Defendants submit that Arroyo's termination was, in part, a result of her work performance. Witnesses have testified that Arroyo's communication with her co-employees, superiors, and customers was sub-par and that her sales were far inferior to other territory managers who were

employed by DGI during the same period of time.

e. **Whether plaintiff retained property belonging to defendants**

As an affirmative defense, Defendants allege that Plaintiff owes DGI an approximate amount of $30,616.00 in company property which she still has under her control. Defendants state that DGI has the right and responsibility of protecting its property. This affirmative defense emanates from Plaintiff's decision, upon advice of her counsel, to retain the possession of jewelry samples and other company property that she admits is not owned by her, but is instead DGI property. This property has not been returned. Defendants submit that this company property was wrongfully retained by the Plaintiff, that it properly belongs to DGI, and that its value has substantially diminished in the three years that the Plaintiff has refused to return the property. Defendants submit that Plaintiff owes DGI the value of the property and if there is an award assessed against the Defendants, it should be reduced by the amount of the property that Plaintiff admits she kept.

f. **Whether Plaintiff Properly Mitigated her Damages**

Defendants submit that Plaintiff's recovery of damages (if any) is barred or reduced by Plaintiff's failure to mitigate her damages. Specifically, Plaintiff had the obligation to seek other employment subsequent to her termination at DGI. Plaintiff was indeed successful in seeking alternate employment. First, she found a job opportunity at Centennial and indeed left DGI's employment prior to the effective date of her termination to begin her job at Centennial. While she was apparently terminated from her job at Centennial as well, Arroyo's damages, if any, would be reduced or eliminated by any monies that she earned, or would have been able to earn, through reasonable diligence. Moreover, she was offered employment by Vijay Khemlani, who owns a

56

jewelry store in San Juan.  Ms. Arroyo turned down that employment without any reasonable basis, despite that she apparently did not have other employment.

g.     **Which DGI Employees are Subject to Law 80?**

There is a dispute as to which employees are subject to Law 80.  The issue is discussed below in the *Legal Controversies* Section in greater detail.  It is the Plaintiff's position that all DGI territory managers are subject to Law 80 and that several territory managers are less senior than Ms. Arroyo. It is Defendants' position that only two territory managers have performed substantial work or resided in Puerto Rico to require DGI to take their employment into consideration when making termination decisions based upon Law 80 - - Ilianny Mera and Eunice Arroyo.  Arroyo is the least senior of these two employees.

In his decision denying summary judgment former Magistrate Judge Arenas stated that Eunice Arroyo, Ilianny Mera, and Chantel Romeu should all be counted as part of the Law 80 analysis.  As discussed below, both parties dispute that portion of Judge Arenas' Order.

**ii. Legal Controversies**

The defendants have identified the following controversies in this case, which are purely legal in nature:

a. **Whether Title VII and Puerto Rico statutes cover discrimination up to and including a termination several months after an employee returns from maternity leave**:

Defendants assert that plaintiff's claim of pregnancy discrimination with respect to her discharge is untenable, because she was not pregnant at the time of her dismissal.  Defendants assert that Law 3 of the Puerto Rico Civil Code specifically forbids termination of employment based on

pregnancy and supports the position that because Arroyo was not pregnant at the time of her termination, that Law 3 does not apply.  In line with the foregoing, the Puerto Rico Supreme Court has held that "this law pursues the protection of the rights of pregnant working women in two different ways: (1) establishing a maternity leave before and after childbirth, and (2) prohibiting the dismissal, suspension, salary reduction, or any other type of discrimination against the woman worker on account of a decrease in the amount of work done because of the pregnancy. *Garcia Pagan v. Caribbean*, 122 D.P.R. 193, 199 (1988)." (Our translation) *Santiago Gonzalez v. Oriental Bank & Trust*, 157 D.P.R. 250, 256 (2002); *Cf. Schneider v. Tropical Gas Company, Inc.*, 95 D.P.R. 626, 632 (1967).  The employer's burden of proof to defend against a claim brought under Law 3 is not that the discharge was motivated by the pregnancy of the plaintiff, but whether she was discharged without cause while being pregnant. *Cf. Santiago González v. Oriental Bank & Trust, supra*. (Translation ours). *See also Sociedad de Gananciales v. Centro Gráfico del Caribe*, 144 D.P.R. 952(1998). In *Martínez Mora v. Acana*, 157 D.P.R. 730 (2002), the Puerto Rico Supreme Court explained that for the presumption against the employer to apply, it is necessary to establish two basic facts: (1) the dismissal; and (2) the state of pregnancy when the dismissal takes place.  *Id.* at 735.

b. **The number of employees — whether Canada counts for Title VII purposes:**

DGI has employees in Florida, Canada and Puerto Rico.  Defendants have also *stipulated* that if both companies are considered, DGI had more than the requisite 15 employees for each of twenty weeks during 2007 and 2008.  Plaintiff maintains that the employees of the Canada company must be counted for Title VII, a legal point which Defendants dispute.  Former Magistrate Judge Arenas decided this issue in Plaintiff's favor.

Defendants contend that Judge Arenas' ruling is incorrect. Only those "employees" who are potentially affected by discriminatory policies may properly be counted to determine whether an "employer" is subject to Title VII. *Goyette v. DCA Adver. Inc.*, 830 F.Supp. 737, 745 (S.D.N.Y. 1993) (finding that foreign employees are excluded from count in determining whether jurisdictional minimum is met). Individuals who do not fall within the statutory definition of "employee" may not be counted in determining whether an entity is an "employer" within the meaning of Title VII. *Laurie v. Ala. Court of Criminal Appeals*, 88 F.Supp.2d 1334, 1347-50 (M.D. Ala. 2000); *Perry v. City of Country Club Hills*, 607 F. Supp. 771, 774 (E.D. Mo. 1983).

An "employee" is defined by Title VII in circular fashion as "an individual employed by an employer…. [but] [w]ith respect to employment in a foreign country, such term includes an individual who is a citizen of the United States." 42 U.S.C.A. § 2000e (f). (emphasis added). Clearly, based upon this language, an individual employed in a foreign country who is not a citizen of the United States is not an employee.

Numerous courts have restricted the definition of "employee" to United States citizens or those employed in the United States. Most recently, the United States District Court for the Southern District of Florida rejected an identical argument identical to the one set forth by Plaintiff and reaffirmed that it lacked subject matter jurisdiction to entertain suit against an entity that does not fall under Title VII's statutory definition of employer. *Mousa v. Lauda Air Luftfahrt, A.G.*, 258 F.Supp.2d 1329 (S.D. Fla. 2003). In *Mousa*, the court conclusively held that foreign citizens based abroad, who worked for a company outside the United States, could not be included in Title VII's fifteen-employee jurisdictional count. The ruling in Mousa is not confined to an isolated assessment. Indeed, it is the prevailing norm in our legal system. Pursuant to and in strict compliance with the

statutory limitations of Title VII (and to the analysis set forth by the Supreme Court in *Aramco*), the vast majority of the federal courts that have considered the same argument Plaintiff made by Arroyo and have refused to extend the definition of "employee" to one which goes beyond its statutory definition. These courts have consistently held that foreign citizens employed abroad who work outside of the United States do not count towards the fifteen-employee jurisdictional minimum. *See Iwata v. Stryker Corp.*, 59 F.Supp.2d 600, 604 (N.D. Tex. 1999) (finding that "[n]on-citizens working outside the United States […] are not considered employees"); *Greenbaum v. Svenska Handelsbanken*, 979 F.Supp. 973, 983 (S.D.N.Y. 1997) (finding that "non-U.S. citizens employed outside of the United States are not deemed 'employees' as that term is defined under Title VII"); *Minutillo v. Aqua Signal Corp.*, No. 96 C 3529, 1997 WL 156495, (N.D. Ill. Mar.31, 1997) (finding that "only a foreign corporation's United States employees may count towards the jurisdictional minimum"); *Russell v. Midwest-Werner & Pfleiderer, Inc.*, 955 F.Supp. 114, 115 (D. Kan. 1997) ("Unless an American citizen, a person employed abroad is not an 'employee' under Title VII."); *Kim v. Dial Serv. Int'l, Inc.*, No. 96 Civ. 3327(DLC), 1997 WL 5902, (S.D.N.Y. Jan.8, 1997) (finding that "the foreign employees of a foreign corporation do not count towards the statutory minimum" and that "the relevant group is the number of employees in the United States"); *Robins v. Max Mara, U.S.A.*, Inc., 914 F.Supp. 1006, 1009 (S.D.N.Y. 1996) ("Only those employees . . . who work in the United States for twenty or more calendar weeks per year are to be counted for purposes of determining whether the enterprise is covered by . . . Title VII"); *Rao v. Kenya Airways, Ltd.*, No. 94 Civ. 6103(CSH), 1995 WL 366305, (S.D.N.Y. June 20, 1995) (finding that "foreign employees of a foreign corporation are not considered employees for purposes of the statute"); *Burnett v. Intercon Sec. Ltd.*, 1998 WL 142395 (N.D. Ill. Mar. 24, 1998).

c. **Number of employees for Law 80 purposes**:

There is a dispute as to which employees at DGI should be considered when determining seniority for Law 80 purposes.

Defendants submit that the only employees that Act 80 should cover are Eunice Arroyo and Ilianny Mera.  Arroyo's misguided interpretation of Act 80 provokes an improper extraterritorial application of the law when discussing the seniority issue.  Once again, by comparing Ms. Arroyo (one of only two Puerto Rico employees of DGI) to the rest of DGI's territory managers, Arroyo improperly requests that a Puerto Rico labor law be applied, albeit indirectly, to employees who respond to and are obliged by laws of other jurisdictions, including a foreign country.  Act 80 cannot be the basis for the determination of whether DGI should retain Arroyo, a Florida resident, or Canadian citizen.

Puerto Rican labor laws apply only to Puerto Rican employees. *See Rodriguez v. Eastern Airlines, Inc.*, 637 F. Supp. 536 (D.P.R. 1986)  (determining that Puerto Rican law would apply solely and exclusively in determining seniority of Puerto Rican employees . . . and any effect it might have on employees outside Puerto Rico would be minimal, because layoffs would be determined locally).

In ruling that Act 80 only applies to Puerto Rican employees, Magistrate Judge Arenas stated that the only case it found on this issue is an unpublished opinion, *Figueroa v. Morgan Stanley Dean Witter, Inc.*, Slip Copy, Civil 07-2088 (CCC), 2009 WL 3747160 (D.P.R. Nov 4, 2009).  In *Figueroa*, the court only considered employees from Morgan Stanley's Puerto Rico branch in its seniority analysis conducted under Law 80.  In its Order and Opinion in the instant case, this Court

agreed with Judge Cerazo's analysis and conclusion in *Figueroa* that only Puerto Rican employees should be considered in DGI's seniority analysis.

However, Defendants submit that Magistrate Judge Arenas then have applied the law to the wrong set of facts. Pursuant to *Figueroa* and this Court's extension of that case, Law 80 should only apply to Puerto Rican employees and DGI's only Puerto Rican employees were Eunice Arroyo and Ilianny Mera. There is no dispute that DGI's only employees who were residents of Puerto Rico or who were based in Puerto Rico were Ilianny Mera and Eunice Arroyo, and that Ilianny Mera was most senior. Defendants take issue with the inclusion of Chantel Romeu as a DGI employee who must be considered in the seniority analysis under Law 80. Ms. Romeu never resided in Puerto Rico, was never based in Puerto Rico, and was never a territory manager for Puerto Rico.

Moreover, prior to Arroyo's termination, Ms. Romeu had only been to Puerto Rico on one occasion, from February 25-27, 2008. On those days, she visited Puerto Rico with Haygo Demir to meet some of DGI's customers in advance of Arroyo's maternity leave. This trip occurred prior to Ms. Romeu's becoming a territory manager.

Certainly, Law 80 should not apply to Ms. Romeu, who at the time of Arroyo's termination, had spent approximately 48 hours in Puerto Rico in her entire life. DGI should not have been required to conduct a seniority analysis between Romeu (who is not based in Puerto Rico, did not work in Puerto Rico, and was not a resident of Puerto Rico) and Arroyo (who was based in Puerto Rico, lived in Puerto Rico, and worked in Puerto Rico) to determine who is most senior under Law 80. Such an analysis is patently unfair to Romeu, who is not a Puerto Rican resident and was not required of DGI.

Moreover, to the extent that Plaintiff attempts to assert that Judge Arenas' ruling is the law of the case and that Chantel Romeu must be considered an employee that Act 80 should cover, such a position is improper.

The rulings or opinions by a judge made while denying motions for summary judgment are not binding as the law of the case. *Coca-Cola Bottling Co. v. Coca-Cola Co.*, 769 F. Supp. 599, 614 (D. Del. 1991). The United States Supreme Court has held that "the denial of a motion for a summary judgment because of unresolved issues of fact does not settle or even tentatively decide anything about the merits of the claim." *Switzerland Cheese Assn. v. E. Horne's Mkt.*, Inc. 385 U.S. 23, 25 (1966); *Watson v. Amedco Steel, Inc.*, 29 F.3d 274, 277 (7th Cir. 1994) (same); *Kutner Buick, Inc. v. American Motors Corp.*, 868 F.2d 614, 619 (3d Cir. 1989) (refusing to bind parties to findings of fact made by the trial judge in denying motion for summary judgment). "An order *denying* a motion for partial summary judgment . . . is merely a judge's determination that genuine issues of material fact exist. It is not a judgment, and does not foreclose trial on the issues on which summary judgment was sought." *Glaros v. H.H. Robertson Co.*, 797 F.2d 1564, 1573 (Fed. Cir. 1986).

Therefore, any statement made by the Magistrate Judge in the Order Denying the Motions for Summary Judgment should be interpreted only in light of the limited purpose for which these statements were made, i.e., to determine whether summary judgment was appropriate and not for the purpose of finding facts or making legal conclusions on a full record disposing of the case on the merits. *See Young v. Calhoun*, 1995 WL 169020 (S.D.N.Y. 1995); *Reefer and General Shipping Co., Inc. v. Great White Fleet, Ltd.*, 1995 WL 575290 (S.D.N.Y. 1995).

In *Dessar v. Bank of America National Trust & Savings Association*, 353 F.2d 468, 470 (9th

63

Cir. 1965), the court stated that:

> The Order denying a motion for summary judgment "**does not purport to decide the question. It merely denies the motion because, in the Court's then view, there were "issuable facts.**" Such a denial merely postpones decision of any question; it **decides none**. To give it any other effect would be **entirely contrary to the purpose of the summary judgment procedure**. The Court did nothing more than it purported to do, that is, refuse to grant the Motion. (Emphasis added)

See also *Paquin v. Federal Nat'l Mort. Assn.,* 20 F.Supp.2d 94, 96 (D.D.C. 1998).

The Seventh Circuit, in *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994) has found similarly:

> We begin our analysis with a few remarks about the nature of summary judgment. **It is not**, as parties opposing summary judgment are fond of pointing out, **a vehicle for resolving factual disputes**. And because summary judgment is not a paper trial, the **district court's role** in deciding the motion **is not to sift through the evidence**, ponder the nuances and inconsistencies, and decide when to believe. **The court has one task** and one takes only: to decide, based on the evidence of record **whether there is any material dispute of fact** that **requires a trial**.

(Emphasis added). It is also well-established that statements regarding the adequacy of a party's claim within a denial on a motion for summary judgment is mere dictum and does not constitute the law of the case. *See Dedham Water Co. v. Cumberland Farms Dairy, Inc*., 972 F.2d 453, 459 (1st Cir. 1992) (stating that "dictum constitutes neither the law of the case nor the stuff of binding precedent"); *U.S. v. Kalb*, 161 B.R. 30, 32 (N.D. Ill. 1993) ("clearly, dicta is not binding on

64

subsequent rulings").

Moreover, even if the Court's prior statements are considered findings of fact, the law of the case doctrine does not preclude either party from offering additional evidence on these issues at trial. *Trustees of Indiana University v. Aetna Casualty and Sur. Co.*, 920 F.2d 429, 435 (7th Cir. 1990) ("so long as the factual issue has not been brought to judgment, the parties are free in the course of the same proceeding to offer evidence on the issue"); *Murphy v. Missouri Dept. of Corrections*, 372 F.3d 979, 986 (8th Cir. 2004) (an initial denial of summary judgment does not establish the law of the case such that the ruling may not be revisited); *Oledeirde v. City of Birmingham*, 230 F.3d 1275 (11th Cir. 2000); *Rosenberg v. American Bowling Congress*, 589 F. Supp. 547, 549 (M.D. Fla. 1984); *Curran v. Kwon*, 153 F.3d 481, 487 (7th Cir. 1998); *Breeland v. Southern Pac. Co.*, 231 F.2d 576, 579 (9th Cir. 1955); *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40 42 (1st Cir. 1994) (interlocutory orders do not become "the law of the case" and "remain open to trial court reconsideration").

In *Kutner Buick, Inc. v. American Motors Corp.*, 868 F.2d 614, 619 (3d Cir. 1989), the court stated:

> The denial of a motion for summary judgment in an interlocutory ruling which **establishes no more than** that on the summary judgment record **there are fact issues which should be submitted to the trier of fact**. Since the record, a trial may be different, such a preliminary ruling **does not determine what issues should be submitted to the jury**.

(Emphasis added). Therefore, the denial of summary judgment preserves rather than resolves issues and does not preclude later reconsideration of matters implicated in the motion. This position is further buttressed by the fact that the Magistrate's statements were in the context of denying a

summary judgment motion where the Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Construction Corp. v. New York*, 762 F.2d 243, 249 (2d Cir. 1985); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-159 (1970); *Hathaway v. Couglin*, 841 F.2d 48, 50 (2d Cir. 1988).

### iii. Mixed Legal and Factual Controversies

a. **The single employer issue**: Defendants stipulate that DGI is a single employer for the purposes of calculating the number of employees under Title VII.  This is the only basis and use for this stipulation.

b. **Whether Plaintiff was the victim of pregnancy and gender discrimination**:

Defendants dispute that Plaintiff was the victim of pregnancy (and gender) discrimination at DGI.  Defendants maintain that Arroyo's termination was proper, lawful, and not the product of any type of discrimination.  As said numerous times herein, the termination was the result of downsizing that DGI was experiencing in 2008 through early 2009, that was the result of financial pressures faced by the company because of the worldwide financial crisis. )

Plaintiff also cannot establish a prima facie case of discrimination because she was not replaced at DGI.  Another employee was not hired to replace her, nor was an existing employee reassigned to perform her work.  The bulk of her work, subsequent to her termination, was performed by Haygo Demir.

c. **Whether Plaintiff has made out a case of retaliation**:

Defendants submit that Plaintiff has raised no actionable claim for retaliation and that any

acts alleged by the Plaintiff occurred post-termination.  Law 115 The statute imposes an obligation on Arroyo to establish, "through direct or circumstantial evidence," a prima facie case that she participated in an activity protected by §§ 194 et seq., and was subsequently discharged. *Cf. Id.*; § 194a(c); *Lupu v. Wyndham El Conquistador*, 524 F.3d 312, 313 (D.P.R. 2008). See also Hoyos v. Telecorp Commc'ns, Inc., 405 F.Supp.2d 199, 207 (D.P.R. 2005); *Rivera Rodriguez v. Sears Roebuck De P.R., Inc.,* 367 F.Supp.2d 216, 230 (D.P.R. 2005).  "An employee establishes a prima facie case under Law 115 by proving that: (1) he engaged in one of the protected activities set forth in the Whistle-blower Act; and (2) he was <u>subsequently discharged</u>, threatened or suffered discrimination at work." (emphasis added). *See* P.R. Laws Ann. tit. 29 § 194a(a); *Irizarry v. Johnson & Johnson*, 2000 TSPR 15, 150 D.P.R. 155, 164, 2000 Juris P.R. 27 (2000)." *MVM, Inc. v. Marcial Rodríguez*, 568 F. Supp. 2d 158, 176-177 (D.P.R.2008).  Here, Defendants submit that there can be no doubt that there was no <u>subsequent</u> discharge.

It is clear that "the Whistle-blower Act covers **current** employees who offer or attempt to offer testimony, and former employees who were **discharged because of an attempt to offer testimony**." *Id.* (Emphasis added).  This type of coverage provided under the Whistle-blower Act does not include Arroyo under the facts of this case.

The claim also fails under Title VII.  For retaliatory discharge, Arroyo must establish: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between her protected activity and DGI's decision to discharge her. *Kestering*, 250 F.3d at 1117. Here, as discussed herein, Arroyo cannot present a prima facie case for retaliatory discharge or any other form of retaliation as the adverse act that Arroyo complains of occurred after her discharge.

d. **Whether defendants can demonstrate "just cause" for the employment actions against plaintiff, as set forth in Law 80 and in pari materia in the Puerto Rico laws prohibiting discrimination**:

The Defendants claim that there was a reduction in workforce at DGI.  Defendants advance two alternative arguments: (1) that seniority was followed because Eunice Arroyo should be compared only with the other Puerto Rico employee, Ilianny Mera; and (2) that other employees were superior to Arroyo

Defendants submit that Ms. Badeau was a current employee and that she was terminated soon thereafter.   Plaintiff submits that even if there *were* a reduction in force, however, Chantel Romeu and Tiffany Cox were both less senior than plaintiff, and the Defendants cannot meet their burden of demonstrating their clear superiority over plaintiff.

Defendants also submits that DGI was not required to follow the seniority standard if Arroyo's work capacity and performance, when compared to the other Territory Managers, demonstrates that, based on clear and convincing evidence, she was not the most qualified and efficient. *See* Miranda Vega v. Cingular Wireless, 568 F.Supp.2d 180 (D. P.R. 2008) (the employee's improper conduct, poor job performance and violation of the employer's policies are deemed "good cause" for dismissal under the statute); Figueroa Garcia v. Lilly del Caribe, Inc., 490 F.Supp.2d 193, 213 (D. P.R. 2007) ("statute allows termination for a number of reasons related to the employee's job performance including an employees' improper and disorderly conduct, negligent attitudes toward her work, and violations of the employer's policies."); Soto v. Corporation of Presiding Bishop of Jesus Christ of Latter-Day, 73 F.Supp.2d 116 (D. P.R. 1999) (Elimination of employee's position and employee's poor work performance was "just cause" for termination).

68

e. **Whether defendants can demonstrate a legitimate basis for their employment decisions pursuant to federal law.**

Plaintiff has submitted absolutely no evidence that shows that a downsizing did not occur. On the other hand, Defendants will prove that downsizing did occur and that the company was facing severe financial pressures.  Defendants will introduce testimony that:  (1) the company and Mr. Demir borrowed hundreds of thousands of dollars in 2008, including borrowed money at the same time that Arroyo was terminated; 2) DGI terminated other employees, or other employees resigned after being asked to take a pay cut or knowing that DGI couldn't pay them; (3) DGI was unable to make payroll on several occasions; (4) customers were buying less merchandise and seeking to return more merchandise; (5) the tax returns show a substantial loss in 2008, despite that it paid less in salaries due to the downsizing; (6) DGI canceled its bonus program in an effort to save money; (7) DGI undertook other cost savings measures.  DGI's employees were all aware of the financial crisis and how it was effecting DGI in 2008.

f. **Whether the purported legitimate business reasons are mere pretexts**:

Defendants' position on this issue is explained in significant detail above.  Simply put, the worldwide economic downturn caused a significant problem in the jewelry industry and adversely affected DGI's business so that Mr. Demir was required to seek substantial loans and terminate numerous employees simply to keep the company afloat.  When making the decision of which employees to terminate, Mr. Demir chose to terminate Ms. Arroyo based upon her work performance and overall potential as compared to others at DGI.

g. **Whether Plaintiff made out a tort injury**:

Again, Defendants vehemently dispute these allegations. Ms. Arroyo was not the victim of any tort injury inflicted by the defendants.

**iv. Evidentiary Issues**

**a. Pie Charts:** Defendants maintain that the pie charts were prepared using documents that demonstrated the sales made within the various territories and that the pie charts are simply a summary of these voluminous documents.  The information within the pie charts were part of the basis for Eunice's termination and the evaluation of the sales consummated by DGI's territory managers.

**b. Incomplete job search documents**:  Defendants contend that they are prejudiced by not being able to view the resume that plaintiff sent with these cover letters and cross examine plaintiff on the contents of the resume.  As such, defendants contend that the exhibit is incomplete.

**4.       PROPOSED STIPULATIONS REGARDING FACTS AND DOCUMENTS**

   1. Plaintiff Eunice Arroyo started working for DGI in August of 2005.

   2. Before being hired, Ms. Arroyo was interviewed by Haygo Demir.

   3. When he decided to hire Ms. Arroyo, Mr. Demir knew that she was a mother of a young child.

   4. Plaintiff was hired as a Territory Assistant.

   5. At all relevant times, Plaintiff has lived in Puerto Rico.

70

6. While she was a Territory Assistant, Plaintiff was "Territory Assistant for Ilianny Mera." Ilianny Mera was the Territory Manager for Puerto Rico and other islands and recommended Eunice Arroyo for her job.

7. There are two corporations named Demir Group International, Inc.

8. One such corporation was organized under the laws of Ontario, Canada.

9. Another corporation named Demir Group International, Inc. is organized under the laws of Florida.

10. DGI is a sales and marketing agency representing brands of watches and jewelry to retailers in the Caribbean, Mexican Duty Free and Alaska markets.

11. Both companies named Demir Group International, Inc. (hereinafter referred to as DGI) are solely owned by defendant Haygo Demir.

12. Defendant Demir is the President, Secretary, Treasurer, and the sole shareholder of both companies.

13. Solely for the purpose of calculating the fifteen-employee minimum for Title VII, these two companies are a single employer.  As noted herein, there is a legal dispute as to whether the employees in Canada should be included in the calculation.

14. Plaintiff's initial salary at DGI was $40,000.00.

15. In early 2007, plaintiff was promoted to the position of Territory Manager, covering Puerto Rico and the Dominican Republic.

16. A few months later, Ms. Arroyo was also given responsibility for the following territories:

Antigua, Barbados, St. Lucia, Dominica and Trinidad.

17. By mid-2007, Ms. Arroyo's salary had increased to $55,000 a year.

18. Ms. Arroyo informed Mr. Demir that she was pregnant during a conference in Las Vegas in September of 2007.

19. Ms. Arroyo's daughter was born on May 1, 2008.

20. Ms. Arroyo was on maternity leave for eight weeks following the birth of her daughter.

21. Chantel Romeu was hired by the DGI in July of 2007 as a Territory Assistant.

22. Ms. Romeu was later promoted to Territory Manager.

23. Tiffany Cox was hired by DGI in early 2007.

24. Tiffany Cox became a Territory Manager in September of 2007.

25. On October 10, 2008, Blanca Rodríguez informed plaintiff that she was being dismissed.

26. The Plaintiff was terminated October 10, 2008 effective November 30, 2008.


**5.**      **NAMES AND ADDRESSES OF WITNESSES, OTHER THAN THOSE TO BE USED FOR IMPEACHMENT AND REBUTTAL**

**A. Plaintiff**

**(1) Plaintiff's witnesses**

The witnesses who will be presented by plaintiff are as follows:

1. Eunice Arroyo

2. Nicholas Burd (via deposition)

3. María Cabiya (via deposition)

4. Tiffany Cox (via deposition)

5. Haygo Demir

6. Dafne Hosaple

7. Ilianny Mera (via deposition)

8. Carmen Pérez

9. Wendy Plaza

The specifics regarding the testimonies of these witnesses are set forth below:

1**. Eunice Arroyo**

Plaintiff will testify, without limits about all of the facts in the complaint and the answer thereto, and all of those set forth above within her personal knowledge.  She will offer testimony about her personal and family history, her education and employment history, her work at DGI, her pregnancy, the discrimination she suffered on the job, how it affected her and what she did about it, as well as the damages she suffered as a result of the adverse actions taken against her, the retaliatory actions taken by Mr. Demir and DGI, the conditioning of payment of earned income on the withdrawal of her legal claim, as well as her efforts to find a job after being fired by DGI.

2. **Nicholas Burd**

Mr. Burd is the accountant for the Canadian company called DGI. His testimony will be

limited to the fact that he discovered in approximately early 2010 that there had been double-billing of expenses for DGI in 2008, with the same expenses attributed to both DGI Florida and DGI Canada.  He will also testify that he has never seen audited financial statements for DGI.

This witness will testify via deposition.  Plaintiff proposes that the Q and A be conducted with an actor playing the part of the deponent.

The following are plaintiff's designations from Nicholas Burd's telephone deposition on February 16, 2011, with Mr. Burd in Canada, defense counsel in Miami, Florida, and plaintiff's counsel in San Juan, Puerto Rico.

**Examination by Mr. Cotzen**

page 6, lines 3 to 8

page 8, line 25 to page 9, line 6

page 23, lines 8-12

page 24, line 9 to page 25, line 14

page 33, lines 6-9

**Examination by atty. Berkan**

page 47, lines 14-15

page 53, lines 6 -20

page 53, line 24 to page 54, line 8

page 55, lines 5 to 10

74

page 57, lines 12 to 19

page 71, lines 9 to 22

page 90, line 16 to page 91, line 22

3. **María Cabiya**

This witness will testify by video-taped deposition.  Her testimony concerns her treatment as an employee at DGI, in particular the circumstances under which she was let go by the company at a critical moment in her pregnancy, approximately within one week of plaintiff's termination.

The entire deposition is being designated by the plaintiff.  It is a video-taped deposition, which can be played for the jury.

4. **Tiffany Cox**

This is a hostile witness and one who is identified with the adverse party.  Ms. Cox still works for DGI.  She is beyond the subpoena power of this court.

Plaintiff's presentation of this witness will be limited exclusively to her being hired at DGI, her prior work history, her knowledge of the Spanish language, her negotiated compensation in salary and other benefits both when she started in the company and the raises which she received since beginning at the company.

Plaintiff proposes that the Q and A be conducted with an actress playing the part of the deponent.

The following are plaintiff's designations from Tiffany Cox's deposition on December 3,

75

2010, by telephone, with the witness in Miami, Florida, and plaintiff's counsel in San Juan, Puerto

Rico:

**Designations from the deposition of Tiffany Cox**

**Examination by Ms. Berkan**

page 7, line 24 to page 8, line 2

page 19, line 22 to page 20, line 9

page 20, line 21 to page 21, line 11

page 21, line 21 to page 22, line 3

page 24, line 19 -20

page 25, line 3; lines 22 to 23

page 26, line 14 to page 27, line 3

page 27, line 20 - page 28, line 1

page 28, line 12 - 13

page 28, line 25 to page 29, line 5      page 30, line 8 to line 19

page 45, lines 4 to 11; line 25 to page 46, line 8

page 47, line 24 to page 48, line 15

page 49, line 16 to 19; lines 21 to 22

page 66, lines 10 -12; line 14 to page 68, line 8

5. **Haygo Demir**

Defendant Haygo Demir will testify as to all matters addressed in the complaint and the answer thereto, without limitations.  This includes testimony regarding the different companies of which he is a principal, the relationship between the operations of DGI Canada and DGI Florida, his hiring of different people, the salaries and bonuses paid, DGI policies on all employee matters, his reaction to plaintiff's pregnancy, the decision to reduce her territory, the decision to fire her, the absence of clear policies at DGI, the fact that employees do not return to work after maternity leave, his limitation of plaintiff's travel, the use of "downsizing" as an excuse for firing Ms. Arroyo, his financial manipulations to demonstrate lower profits than his companies actually have, his use of other companies to provide expenses to DGI, and similar matters.

6**. Dafne Hosaple**

This is plaintiff's sister.  She may testify about plaintiff's history, the different jobs she held, her family situation and her excitement and dedication to her work.  She may testify about plaintiff's attitude concerning her work at DGI and her commitment to it, as well as her extreme distress once due to the discriminatory actions to which she was subjected.  She may also testify to the letter her sister composed, and which she edited and translated into English questioning the reduction of her territory, a decision made during her maternity leave.  She will also testify as to her own advice to her sister, to send the letter, but the fact that her sister did not do so, for fear that she would be subject to reprisal. She may also testify about the effect both the discrimination and the loss of the job had on the plaintiff, and the fact that she lent plaintiff money during this period.

7**. Ilianny Mera**

This witness will testify through a deposition.  She resides outside of Pueto Rico, beyond the

reach of a subpoena.  Plaintiff proposes that the Q and A be conducted with an actress playing the part of the deponent.

Ms. Mera's testimony will address her own work as a DGI employee, her knowledge of plaintiff and her history, and Ms. Mera's recommendation that Ms. Arroyo be hired by DGI.  Ms. Mera will also testify as to the quality of plaintiff's work and feedback from customers concerning the same.  She will also address attitudes exhibited by Mr. Demir and other DGI management, as well as particular comments made by Mr. Demir, demonstrating his animus towards pregnant women.

Ms. Mera will also offer testimony regarding plaintiff's announcement of her pregnancy, how this affected plaintiff's progress at DGI, and the fact that pregnant women are not welcome at DGI. She will also testify that Territory Managers do not have a great deal of contact with shopping guides.

Ms. Mera will also testify as to the close relationship between Haygo Demir and James DeMattei.

She will also talk about Eunice Arroyo's excellent relationship with customers, including Vijay Khemlani and will explain why Reinhold Jewelers did not do business with DGI, for reasons wholly unrelated to Eunice Arroyo's performance.

She will also testify that as a DGI employee, she was never told that the bonus program was being eliminated.

Ms. Mera will also testify about the circumstances under which she left DGI, contrary to defendants' assertion that she had stolen money from the company.  She will also testify concerning

the retention of Tiffany Cox, rather than Eunice Arroyo, as a DGI employee.

The following pages of her deposition are designated for reading to the jury (although some may not be used, as they are really just to rebut theories or factual allegations raised by defendants):

**Designations of Ilianny Mera telephone deposition, January 19, 2011**

**Examination by atty. Berkan**

page 3, line 3 - page 4, line 12

page 7, line 17 - page 8, line 1

page 11, line 11 - page 12, line 2

page 12, line 20 - page 13, line 6

page 13, lines 10 - 23

page 14, line 7 - page 15, line 21

page 16, lines 5 - 22

page 16, end of line 25 - page 18, line 19

page 19, line 11 to page 20, line 18

page 21 (second word of line 2) to page 22, line 15

page 26, line 15 to page 27, line 3; line 12 (second sentence) to line 23

page 28, line 24 to page 29, line 3; lines 22 to 25

page 30, lines 2-7; lines 11-15; lines 18-25

page 31, lines 4 to 6; lines 25 to page 32, line 9;

page 32, line 12 (second sentence) to p. 33, line 9

page 34, line 2 to page 35, line 11

page 35, line 23 to page 36, line 11

page 36, lines 12 to 22

page 37, lines 12 to 25

page 39, line 24 (second sentence) to page 40, line 5

page 40, lines 11-15; line 23 to page 41, line 2; line 19 to page 42, line 8

page 47, lines 6 to pge 49, line 3

**Examination by atty. Cotzen**

page 72, lines 7 to 25

page 87, line 14 to 17; line 25 to page 86, line 1

page 89, line 11 to page 90, line 19

page 92, line 24 to page 93, line 25

**Deposition of Ilianny Mera by telephone, April 4, 2011**

**Examination by Mr. Cotzen**

page 8, lines 10 to 23

page 34, lines 4-9; lines 18 to 25

page 36, lines 9-24

page 49, lines 2-15

page 50, lines 11 -14

page 67, line 25 to page 68, line 16

page 69, lines 6 to 23

page 71, line 21 to page 72, line 13; page 72, line 16 to page 73, line 12

page 76, line 5-15

page 78, line 2 (mid-line) to 7

**Examination by Ms. Berkan**

page 94, line 22 to page 95, line 3

page 97, lines 7 to 19

page 98, lines 10 to page 99, line 10

page 102, line 7 to page 103, line 22

page 104, line 4 (last word) to line 10

**Telephonic Deposition on April 11, 2011**

**Examination by Mr. Cotzen**

page 23, line 4; line 15 to page 25, line 2

page 30, line 3 to page 31, line 23

8. **Carmen Pérez**:

Plaintiff's mother, who may testify about plaintiff's family and work history, to her
commitment to her work, comments plaintiff related to him about her work, her pregnancy and the

81

discrimination she told her mother she was facing on the job. Ms. Pérez also may testify about her observations of her daughter performing work for DGI (sometimes into the early morning hours), as well as her observations of the reactions of jewelry store personnel to Ms. Arroyo. Attorney Pérez may also testify as to her advice to her daughter when DGI insisted on her *returning* payments she had received during maternity leave, as well as her assistance to her in assuring that the company was apprised of the fact that its actions were in *violation* of Puerto Rico law.  She also may testify about her daughter's reaction when being told, during her maternity leave, that DGI was taking territory away from her, and her distress at no longer being allowed to travel. She has considerable information to offer regarding the damages plaintiff has suffered, both emotionally and physically, as well as economically, and how the family had to help her out financially.

Ms. Pérez will need the services of an interpreter.

### 9. **Wendy Plaza**

Ms. Plaza worked at Bared, a customer of DGI, with several jewelry stores in Puerto Rico. She is also a friend of Ms. Arroyo, having known her since they both worked in the mortgage industry.  She may testify as to the quality of plaintiff's work, her sense of responsibility, her commitment to the job, and the customer service she offered to Ms. Plaza's former employer, as well as her overall reputation for excellence in the industry and the appreciation which Bared employees had for her work, for her training, merchandising and general customer service.  She may also testify as to contemporaneous complaints she heard from Eunice during her pregnancy and after her return from maternity leave, regarding the discriminatory and harassing treatment she was receiving at DGI. She may also testify about the close-knit nature of the jewelry industry in the Caribbean and the

82

comments circulating in the industry that Eunice Arroyo had been fired for doing a poor job.  She can also talk about the damages suffered by Ms. Arroyo.

Ms. Plaza will need the services of an interpreter.


Plaintiff expressly reserves the right to call as a witness any of the witnesses announced by the defendants.


**(2) Plaintiff's response to witness and deposition designations by defendants**

**1. Nicholas Burd**

**A. Objections to defendants' designations with respect to Nicholas Burd**

•   Page 27, line 16 to page 28, line 8.  These questions and answers concern a document which is *inadmissible* as an improper summary, without complying with the requirements of Rule 1006 of the Federal Rules of Evidence.  This is a document which was prepared for *litigation purposes*, in order to produce "evidence" in favor of defendants' position.  The witness, himself, states that he prepared this document, about two to three weeks before his deposition "in order to see what the results of operations ... *would have been*" based on certain premises provided to him by defense counsel.  This testimony is based on a *post-hoc* improper summary document prepared for litigation.  It is, moreover, expert testimony being offered by a witness who has not been announced as an expert and as to whom no disclosures have been provided.

83

- Page 31, line 17 to page 32, line 4.  Again, this testimony is based on the inadmissible documents referenced above.

- Page 33, line 10 to 19.  This is improper expert opinion testimony from a witness not named as an expert and as to whom no expert disclosures were made.

- Page 34, line 13 to 24.  These are follow-up questions regarding the expert opinion testimony referenced above.

- Page 36, line 12 to 17.  Questions eliciting an expert opinion, inadmissible for the reasons set forth above.

- Page 37, line 8 to 9; and lines 11-23.  Plaintiff objects to the reference to the exhibit, which is the inadmissible document, prepared for *litigation purposes*, shortly before Mr. Burd's deposition.  Plaintiff does not object tot the reference to "$866,000 in revenue," at the end of line 10.  Nor does she object to the continuation of Mr. Burd's testimony, beginning at line 25 on page 37.

- Page 43, line 17 to 21.  Plaintiff objects to the question, in that it does not incorporate the stipulation of the parties that Mr. Burd is referring *exclusively* to DGI Canada. If the word "Canada" is added, or the stipulation read concurrently with the question, plaintiff would not object.

- Question at page 43, line 22-24, and answer thereto.  Objected to as leading question, impermissible on direct examination.

- Questions at page 44, lines 1-3, 5-6, and 8-12, and answers thereto.  Objected to as leading questions, impermissible on direct examination.

84

- Question at page 44, line 22-25, and answer thereto, as well as follow-up question at page 45, line 8 and answer thereto. These questions refer to documents which are *inadmissible* in evidence, improper summaries, prepared for litigation purposes.

- Question at page 46, line 23 -25, and answer thereto.  This calls for speculation, as well as expert testimony on the part of a witness who has not been announced as an expert, and as to whom no disclosures have been made.  It is also based on a hypothetical with no basis in the evidentiary record.

**B. Counter-designations as cross examination of Nicholas Burd[6]**

- Page 30, line 5-11 would be designated by *plaintiff*, in addition to defendants, in order to demonstrate that much of Mr. Burd's testimony is based on an improper and inadmissible *post-hoc* summary document and is improper expert testimony for the reasons set forth above.

- Page 30, line 12 to page 31, line 3.  Here, Mr. Burd again asserts that the documents to which plaintiff is objecting were prepare in the context of *this litigation*, in preparation for his *deposition.*

---

[6]When putting these counter-designations into the record (with this witness as well as with others), plaintiff reserves the right to re-state portions of the deposition designated by the defendants, so that proper context can be maintained.

**2. <u>Cristina Cox</u>**

**A. <u>Objections to defendants' designations with respect to Cristina Cox</u>**

•     Page 16, line 11 should be eliminated.  It is an objection which will not be made at trial.

•     Question at page 61, line 10 to 12 and answer thereto — suggestive, leading, and calls for a legal conclusion outside the competency of this witness (as to meaning of "discriminate").  It is an improper use of leading question on direct examination.

•     Question at page 61, line 14 to 19 and answer thereto.  — suggestive, leading, and calls for a legal conclusion outside the competency of this witness (as to meaning of "discriminate").  It is an improper use of leading question on direct examination.

•     Question at page 61, line 23 to page 62, line 1 and answer thereto.  — suggestive, leading, and calls for a legal conclusion outside the competency of this witness (as to meaning of "discriminate").  It is an improper use of leading question on direct examination.

•     Question at page 63, lines 14 to 16 and answer thereto.  Leading question, improper on direct examination.

•     Question at page 64, lines18-20 and answer thereto. Leading question, improper on direct examination.

•     Question at page 65, line 9 and answer thereto. Leading question, improper on direct examination.

- Question at page 65, lines 11-13 and answer thereto.  Leading question, improper on direct examination.  Also, irrelevance and lack of personal knowledge (as to other retailers, cruise lines, brands and "everybody was struggling"); hearsay; speculation

- Question at page 65, lines 19-20 and answer thereto.  Lack of personal knowledge; speculation; irrelevance; lack of proper foundation; assumes facts not in evidence.

- Question at page 64, lines 23-25 and answer thereto. Leading, Lack of personal knowledge; hearsay; lack of proper foundation;  speculation; irrelevance.

- Objection at page 66, line 16.  This is an objection which will not be made at trial and therefore should not be designated.

- Question at page 67, lines 6-7 and answer thereto.  Leading question, improper on direct examination.

- Question at page 67, lines 17 to 18 and answer thereto.  Leading question, improper on direct examination.

- Question at page 68, lines 2-3 and answer thereto.  Leading question, improper on direct examination.

- Question at page 68, line 4 and answer thereto.  Leading question, improper on direct examination.

- Question at page 68, lines 17-18 and answer thereto. Leading question, improper on direct examination.

- Question at page 70, lines 18-10 and answer thereto.  Leading question, improper on

direct examination.

•     Question at page 70, lines 23-25 and answer thereto.  Leading question, improper on direct examination.

•     Question at page 71, lines 4-6 and answer thereto.  Leading question, improper on direct examination.

•     Question at page 71, lines 20-21 and essentially same question at page 73, lines 1-3 and answer thereto.  Leading question, improper on direct examination.

•     Question at page 72, line 7 and follow-up questions through line 12 and answer thereto. With the elimination of the previous questions, these questions lack proper foundation and assume facts not in evidence.

**B. Counter-designations as cross examination of Cristina Cox**

•     Page 16, lines 13 to page 17, line 4

•     Page 17, line 6 to page 18, line 3

•     Page 21, line 20 - 23

•     Page 22, line 22 to page 23, line 3

•     Page 27, lines 9 - 11

•     Page 30, lines 12 to 17

•     Page 32, line 20 (last word) to line 23; line 25 to page 33, line 8

- Page 35, lines 5-9

- Page 37, line 18 to page 38, line 13

- Page 39, lin3 15 to page 40, line 6

- Page 42, lines 8 to 24

- Page 43, line 9 to page 44, line 8 (except last word)

- Page 44, line 12 to page 45, line 1

- Page 46, line 16 to 25

- Page 47, line 13 to 15

- Page 50, lines 8 to 15

- Page 57, lines 9 to 11

- Page 58, line 5 to page 60, line 7

- Page 69, lines 5 to 14

- Page 73, lines 4 to 8

- Page 75, line 18 to page 77, line 12

- Page 78, lines 3-12; 15-20 (depending on ruling on whether this witness can answer the questions about "discrimination" objected to above)

- Page 78, line 21 to page 79, line 24

- Page 79, line 25 (except last word); page 80, lines 4 to 10

**3. James DeMattei**

89

A. **Objections to defendants' designations with respect to James DeMattei**

•        Question at page 10, line 7 and answer thereto at Line 8 to beginning of Line 9.  Lack of personal knowledge regarding "most companies in the luxury goods business;" hearsay; lack of proper foundation; speculation; irrelevance; improper opinion testimony.

•        Question at page 11, lines 17-20 and answer thereto.  To the degree that this seeks to elicit testimony about "the jewelry business" in general, it is objected to due to lack of personal knowledge, hearsay, lack of proper foundation; speculation, improper opinion testimony.

•        Question at page 12, line 4 and answer thereto, as well as follow-up questions through page 13, line 10.  As to other businesses, lack of personal knowledge, hearsay, lack of proper foundation; speculation, improper opinion testimony.

•        Question at page 13, lines 11-12 and answer thereto, as well as follow-up question at page 13, line 17.  Irrelevance as to measures taken by a different company to cut costs and deal with economic adversity.

•        Question at page 14, lines 2-4, and follow-up questions at lines 9, 19 and 22.  First Question is a leading question, improper on direct examination; follow-up questions should be disallowed for lack of proper foundation and because they are leading.

•        Question at page 14, lines 24 to 25 and answer thereto. Leading question, improper on direct examination

•        Question at page 15, lines 4 to 6 and answer thereto. Leading question, improper on

direct examination.

- Question at page 15, lines 15 to 16 and answer thereto. Leading question, improper on direct examination; with exclusion of prior question, lack of personal knowledge; speculation; lack of proper foundation.

- Question at page 15, lines 10-21 and answer thereto. The witness is engaging in speculation, without personal knowledge as to the "result of sales of Philip Stein dropping [with respect] to Mr. Demir's business; speculation; lack of proper foundation.

- Question at page 15, line 24 to 25. This is follow-up to the preceding question. Speculation; lack of proper foundation; lack of personal knowledge.

- Questions related to Exhibit 6 of the deposition — starting page 25, line 23 and continuing through page 27, line 1.  These concerns loans made in 2010, two years *after* plaintiff was fired.  They are objected to on the basis of relevance.

- Question at page 27, lines 5-6 and answer thereto.  Leading, improper on direct examination, lack of proper foundation.

- Question at page 27, line 8-9 and answer thereto.  Leading, improper on direct examination, lack of proper foundation.

- Question at page 27, lines 11-12 and answer thereto.  Leading, improper on direct examination, lack of proper foundation.

- Question at page 27, line 16-18 and answer thereto.  Leading, improper on direct examination, lack of proper foundation.

- Question at page 40, line 6, and follow-up thereto through line 22.  The answers demonstrate that the testimony is hearsay based on comments made by third party declarants; also irrelevance as to the comment that "we were all suffering at that time."

- Question at page 41, lines 10-12 and answer thereto.  The answer clearly demonstrates that Mr. DeMattei's comments are hearsay.

- Question at page 42, line 8-10 and answer thereto at line 18-19.  Irrelevance as to Mr. DeMattei's company.

- Question at page 42, line 22 -25 and answer thereto. Calls for opinion testimony, expert testimony without expert disclosures, hearsay, speculation, lack of proper foundation.

- Question at page 43, line 24 to 25 and answer thereto.  Calls for opinion testimony, expert testimony without expert disclosures, hearsay, speculation, lack of proper foundation.

## B. Counter-designations as cross examination of James DeMattei

- Page 18, lines 6 to 8

- Page 27, line 24 to page 29, line 15

- Page 30, lines 1-2

- Page 31, line 1 to page 32, line 10 (only if the questions concerning "Exhibit 6" are

92

permitted on direct).

• Page 32, line 22 to page 33, line 2

• Page 40, line 23 to page 41, line 1 (only if the questions on page 40 to which plaintiff objects are allowed into evidence.)

• Page 41, line 24 to page 42, line 1


**4. Sandford Horowitz, CPA**

**A. Objections to defendants' designations and to the presentation of this witness**

The entire testimony of this witness is objected to as completely **cumulative**.  This is DGI's Miami-based accountant, whose testimony relates to matters which will be attested to by Haygo Demir, in particular, economic difficulties being faced by DGI in 2008 and shortly before and after that year.  His only knowledge of these matters is based on what Mr. Demir told him.  He prepared tax returns, but did **not** prepare any **audited** returns or statements.


**B. Objections to specific record designations with respect to Sandford Horwitz**

The following objections are being made as to Mr. Horwitz's testimony, in the event that this court allows the defendants to present this witness:

• Page 64, line 7 to page 65, line 14.  Hearsay, lack of personal knowledge; lack of proper foundation; cumulative.

• Page 102, line 3 to page 103, line 5.  Hearsay, lack of personal knowledge, lack of

93

proper foundation, cumulative, improper opinion testimony.  This testimony is based on Canadian Tax Returns, as to which Mr. Horwitz, a Certified Public Accountant in Florida has absolutely no specialized knowledge or expertise.  He is, rather, merely reading a return which was provided to him by DGI counsel in the context of this litigation and a thoroughly *inadmissible*.  His interpretation of the Canada Tax return completely lacks reliability.   Additionally, although he is a CPA, he was not announed as an expert, and no expert disclosures were made.  He cannot testify as to matters as to which he had no involvement and offer opinions related thereto.

Mr. Horwitz's testimony, moreover, is based on other *inadmissible* documents, in particular "Financial Statements" prepared on ***July 2, 2010***, for the sole purpose of producing "evidence" for this litigation.   These are not audited statements.  They are, rather improper summaries, thoroughly inadmissible pursuant to Rule 1006 of the Federal Rules of Evidence.   The underlying documents can "conveniently be examined in court" without such improper summaries and without the need for Mr. Horwitz to interpret the summaries prepared for litigation purposes.

· Page 103, line 11 to 14. Objected to for the reason stated above.  This question is based on inadmissible documents.

· Page 103, lines 20 to page 105, line 16.  Objected to for the same reason.  This testimony is based on documents which are inadmissible, prepared for litigation purposes and improper summaries.  On these pages, Mr. Horwitz is asked to interpret data provided to him by counsel as to the combined operations of DGI Canada and

94

DGI Florida.  As DGI's Florida accountant, Mr. Horwitz has no direct knowledge of the Canada operation.  He also cannot testify as an expert with respect to matters related to the Canada company, both because he is not an accountant in Canada and because he was not announced as an expert in this case.

- Page 109, line 7 to page 110, line 20.  The first question and its clarification at line 7-14 are objected to, because they refer to both the DGI Canada entity and the Florida entity.  Mr. Horwitz has no knowledge of the latter.

    Independently of the above, to the degree that Mr. Horwitz limits his testimony to the Florida corporation, he nonetheless basis his opinions on these documents created *post-hoc* for litigation purposes.  Once again, he is testifying on the basis of litigation documents which are inadmissible, as set forth above, and as to which, even if he *were* an expert, he has no specialized knowledge.

- Question at page 110, line 21 and answer thereto.  This is objected to for the same reasons.  In addition, this is a leading question, improper in direct examination.

- Question at page 111, line 1 and answer thereto, as well as follow-up questions through line 16.  These are objected to for the same reasons.  In addition, the first question is is a leading question, improper in direct examination.

- Question at page 111, lines 17-24.  Objected to because the question is based on the inadmissible documents as set forth above, prepared explicitly for litigation purposes, improper summaries and containing documents about the Canada operation, beyond Mr. Horwitz's knowledge.  It is also objected to because Mr. Horwitz is not an

95

announced expert and no disclosures were made.  Yet, the question solicits his opinion on matters beyond his actual work with DGI.  Moreover, it calls for speculation.

•   Question at page 112, line 25 to page 113, line 3 and answer thereto.  Leading question, improper on direct examination.  Also, it calls for improper opinion testimony and hearsay.

•   Question at page 114, lines 3-8 and 11-13 and answer thereto.  This is objected to because it is based on a summary document (referred to by the witness, himself, as a "snapshot"), which was prepared in the litigation context, objectionable for the reasons stated above.

Additionally, as pointed out at page 114, lines 17-25, he had failed to notice an *error* in the presentation included in the improper summary documents, which was only pointed out to him by plaintiff's counsel *during* the deposition, and which he "would have brought ... out" had he noticed the error.[7]

•   Page 115, lines 1-23.  These questions are all related to the Canada DGI, as to which Mr. Horwitz's testimony is clearly inadamissible.

_____

[7]In the event that this court allows Mr. Horwitz testimony regarding these summary documents, over plaintiff's objections, then plaintiff would designate page 114, lines 17-25 of the Horwitz deposition.

### C. **Counter-designations as cross examination of Sandford Horwitz**[8]

- Page 7, line 7 to line 9 (first part)

- Page 10, line 20 to page 11, line 14.  These designations are made only if Mr. Horwitz is permitted to testify based on information from the Financial Statements he prepare *in the litigation context*, and not as an announced expert, in *July of 2010.* (In this part of his deposition, he explains the difference between this kind of unverified financial statement and audited financial statements.)

- Page 12, line 10 (first five words); line 17 to page 13, line 17

- Page 14, line 12 to page 15, line 1.

- Page 16, line 24 to page 17, line 12

- Page 17, line 25 to page 18, line 17; page 19, line 18 to page 21, line 2 (this is where Mr. Horwitz explains that the Financial Statements referenced above were prepared on the basis of the tax returns).  These pages are designated for use in the event that this court allows Mr. Horwitz to testify about the content of the Financial Statements which were prepared in July of 2010 for litigation purposes.

- Page 21, line 2 to 5 (first part); lines 12-15.  Again, this is contingent on the court's ruling.  Here, Mr. Horwitz explains that the Financial Statements were prepared in July of 2010 because "the attorneys needed them" and that this was the first time such unaudited Financial Statements had been prepared for DGI and/or Mr. Demir.

---

[8]These designations are made only in the event that the court allows this witness to testify, i.e. if it rules against plaintiff's objection to the presentation of this witness as set forth above.

- Page 21, line 25 to page 23, line 6.  This is subject to the same contingency.  Here, Mr. Horwitz indicates that the July, 2010 documents are merely "compilations" based on representations by DGI Management.

- Page 26, line 20 to page 27, line 8.  Again, this depends on the court ruling, particularly with respect to Mr. Horwitz's testimony regarding DGI Canada.  He states in these pages that he "barely thumbed through" the Canadian tax returns, and then only days before his deposition, "to be better prepared for this deposition."

- Page 29, line 2 to 8; and line 17-21.  Here, Mr. Horwitz explains that he was asked to prepare a compliation, not an audited statement, in the summer of 2010, and that this was the first time he was asked to do so.

- Page 32, line 21 to page 33, line 4.  This testimony is designated only if Mr. Horwitz is permitted to testify about the contents of the Financial Statements referenced above.

- Page 34, line 25 to page 35, line 18

- Page 37, line 14, to page 38, line 4

- Page 38, line 5 to 12.  Here, Mr. Horwitz again affirms that he does not have information about DGI Canada.

- Page 40, line 14 to page 41, line 12; page 41, line 18 to page 42, line 3.

- Page 42, line 23 to page 43, line 1

- Page 43, line 14 to page 44, line 3.  Again, this concerns Mr. Horwitz's lack of

knowledge of DGI Canada, and the fact that he obtained the Canada tax returns shortly before his deposition, through counsel for DGI, Michael Cotzen.

• Page 44, lines 11-12; line 18- page 45, line 10. This is contingent on the court's rulings. It is where plaintiff's counsel points out disparities between the tax filing year of DGI Canada and DGI Florida, with Mr. Horwitz specifically stating that he had not noticed that.

• Page 51, line 23 to page 53, line 1.

• Page 66, line 10 to 25; page 67, line 23 to page 69, line 1

• Page 71, line 22; page 72, line 16

• Page 75, line 17 to page 76, line 23

• Page 81, lines 4 to 18

• Page 90, line 14 to page 91, line 12

• Page 95, lines 8-13. This, again, demonstrates that Mr. Horwitz merely scanned the DGI Canada returns and that he had not noticed that they were based on a different tax year, until plaintiff's counsel pointed that out on the day of the deposition.

• Page 99, lines 14 to 22

• Page 105, line 24 to page 106, line 6.

• Page 114, lines 17-25 (See comment in footnote 7 above.)

**5. Allen Klein**

**A. Objections to defendants' designations with respect to Allen Klein**

- Page 9, line 8 to page 10, line 12. These Questions and Answers are objected to on the basis of relevance. These questions concern the financial health not of DGI, but rather of Mr. Klein's company.

- Questions at page 10, line 13-15 and lines 23-24 and answers thereto. These Questions and Answers are also objected to on the basis of relevance, as they relate to cost-cutting measures by Mr. Klein, not Mr. Demir. In addition, they are leading question, improper on direct examination.

- Questions at page 11, lines 7 to 17 and answers thereto. These address cuts to employee compensation and the number of employees in Mr. Klein's company and are irrelevant.

- Questions at page 11, line 18 to page 12, line 11. These questions elicit expert testimony concerning the state of the entire jewelry industry. They are objected to because of relevance and as improper opinion and expert testimony.

- Page 12, line 15 to 16. This is an objection by plaintiff's counsel which will not be made at trial.

- Page 14, line 23 to 25. This is an objection by plaintiff's counsel which will not be made at trial.

**B. Counter-designations as cross examination of Allen Klein**

- Page 8, lines 14-19

- Page 18, line 16 to 18.

- Page 18, line 25 to page 19, line 15.

- Page 19, line 18 to page 20, line 21

- Page 21, lines 12 to 22

- Page 21, line 23; page 22, lines 1 to 4; page 22, line 12 to page 23, lin3 4

- Page 24, line 6 to 8, line 10 to 14.

- Page 26, line 6 to 8.

- Page 27, line 21 to page 28, line 6.

- Page 29, line 6-9.

- Page 30, line 4 to page 32, line 5

- Page 32, lines 6 to 22

- Page 33, line 25 to apge 34, line 2

- Page 35, line 1 to 25

## 6. Vijay Khemlani

Plaintiff objects to the presentation of this witness *via deposition.*  He lives in Puerto Rico and is subject to subpoena in this district.  Unless defendants can demonstrate his unavailability to offer trial testimony, the deposition should not be used in *lieu* of testimony at trial.

If Mr. Khemlani's deposition is used, plaintiff has the following objections and counter-

designations thereto.

**A. Objections to defendants' designations with respect to Vijay Khemlani**

- Question at page 34, lines 5-6 and answer thereto. Leading question, impermissible on direct examination.

- Question at page 34, lines 9-10 and answer thereto. Leading question, impermissible on direct examination.

- Question at page 34, lines 13-14 and answer thereto. Leading question, impermissible on direct examination.

- Question at page 34, lines 17-18 and answer thereto. Leading question, impermissible on direct examination.

- Question at page 36, lines 4-5 and answer thereto. Leading question, impermissible on direct examination.

- Question at page 36, line 15-16 and answer thereto. Leading question, impermissible on direct examination.

- Question at page 37, lines 7-8 and answer thereto. Objection as mischaracterizing prior testimony. Improper foundation.

- Question on page 42, line 18-20 and answer thereto. Irrelevant (regarding other businesses) and lack of personal knowledge, calls for hearsay and speculation.

**B. Counter-designations on cross examination of Vijay Khemlani**

- Page 11, lines 15 to 21

- Page 14, line 20 to page 15, line 7

- Page 19, line 6-8; line 18-21

- Page 21, line 18 (first full sentence) to 25

- Page 25, line 18 to page 26, line 23

- Page 28, line 9 -10; line 19 - page 29, line 7

- Page 29, line 14 to page 30, line 6

- Page 30, line 7 -page 31, line 2

- Page 31, line 14 to page 32, line 9

- Page 32, line 24 to page 33, line 1

- Page 37, line 16 to page 38, line 10

- Page 38, line 14 to 22; line 24 to page 39, line 20

- Page 39, line 21 to page 40, line 13

- Page 41, line 8 to line 19

- Page 42, line 1 to 5

- Page 44, line 11-13, and 15

- Page 48, line 17 to page 49, line 3

- Page 49, line 23 to page 50, line 6

- Page 50, line 18 to page 51, line 8

- Page 51, line 10 (starting with second word) to line 13; line 16 to page 52, line 5

- Page 53, line 16 to 20

**7. Ilianny Mera**

Defendants have made counter-designations with respect to this witness.  The plaintiff objects to the following counter-designations, for the reasons set forth herein.

**Defendants' counter-designations of Ilianny Mera's deposition**

**Telephone deposition - Jan. 19, 2011**

50:16 - 52:12  Several leading questions, beyond the scope

53:18 - 53:22  Completeness, if allowed, should go thru 54, line 2

56:13 - 56:21   Leading questions, beyond the scope

60:21 - 62:3  Several asked and answered

62:10 - 63:3 Several asked and answered

63:4 - 63:9 Asked and answered

63:24 - 65:14 For completeness would need through line 20

82:22 - 83:8  for completeness, through line 10

95:15 - 95:17 misleading, rule 403, offer to stipulate should be noted for completeness

**Telephone deposition of Ilianny Mera April 4, 2011**

16:25 - 19:6 misleading, due to subsequent court rulings, Rule 403

24:7 - 24:25   Objection, misleading, unfair prejudice, Rule 403, in light of defendants' knowledge that Berkan did not hire the witness's attorney, as evidenced in documents already sent

104

to defendants.  If admitted, an instruction would have to be given to the jury.

25:6 - 25:15   Objection, misleading, unfair prejudice, Rule 403, in light of defendants' knowledge that Berkan did not hire the witness's attorney, as evidenced in documents already sent to defendants.  If admitted, an instruction would have to be given to the jury.

26:23 - 27:4   Objection, misleading, unfair prejudice, Rule 403, in light of defendants' knowledge that Berkan did not hire the witness's attorney, as evidenced in documents already sent to defendants.  If admitted, an instruction would have to be given to the jury.

30:9 - 31:1  Need through line 4 for completeness

31:15 - 32:17  Need line 18 for completeness

34:18 - 35:11  Need through page 36, line 8 for completeness

39:22 - 39:23  Leading, beyond the scope

40:4 - 40:21 Leading, beyond the scope

40:24 - 41:22  Leading, beyond the scope

45:5 - 45:9 Leading, beyond the scope

45:20 - 45:25 Leading, beyond the scope

47:6 - 47:12 Leading, beyond the scope

47:19 - 48:4 Leading, beyond the scope

63:4 - 63:15, misleading, in light of subsequent court rulings, Rule 403

90:21 - 91:5, potentially beyond the scope, would need through page 92, line 1 for

completeness

99:15 - 99:24, Objection, misleading, unfair prejudice, Rule 403, in light of defendants knowledge that Berkan did not hire the witness's attorney, as evidenced in documents already sent to defendants.  If admitted, an instruction would have to be given to the jury.

**Telephone deposition, April 11, 2011**

No objections

**8. Joe Salva**

**A. Objections to defendants' designations with respect to Joe Salva**

• 　Page 15, line 3 to 15.  This testimony, which includes Mr. Salva's impression of the quality of plaintiff's work at DGI is well beyond the Rule 26 disclosures; it was an unfair surprise at the time of the deposition.  *See, Motion to Exclude witnesses, Docket # 56, and discussion during the deposition of Mr. Salva, at page 15, line 16.*  In the defendants' belated November 3, 2010 Rule 26 supplementation, the disclosure given with respect to Mr. Salva relates exclusively to "a loan provided to Mr. Demir in 2008," and the overall economic situation impacting the jewelry industry at that time.  In his deposition, however, the defense sought testimony about plaintiff's performance, constituting unfair surprise.  *See, reference at Deposition of Salva, at page 75, lines 1-page 76, line 2, wherein counsel discusses the limited*

106

*nature of Mr. Salva's testimony, as set forth in the mandatory (albeit belated) Rule 26 disclosures.  See, also, page 77* ("We were told under what's called mandatory disclosures that your testimony would be about the loan that you provided to Mr. Demir.  We were thoroughly and completely surprised today to hear you testify about other matters that were never disclosed to us."

- Page 16, line 2 to 18.  Same objection.  Mr. Salva is offering opinions about the quality of plaintiff's work.  He was not announced as a witness to offer testimony of this nature.  Unfair surprise.

- Page 18, lines 2 to page 19, line 4.  This is objected to for the same reason.

- Question at page 33, line 6 and answer thereto, and question at page 33, line 20-23 and answer thereto.  These are objected to on the basis of relevance.  The question concerns economic difficulties faced by Mr. Salva's company, not by DGI.

## B. Counter-designations on cross examination of Joe Salva

- Page 13, line 19 to page 15, line 2

- Page 37, lines 5-20

- Page 39, line 16 to page 41, line 5

- Page 41, line 21-24

- Page 47, line 2 -25; page 48, line 9 - page 49, line 5.  This designation is made only in the event that the court allows Mr. Salva to testify about plaintiff's performance, a subject matter to which plaintiff has objected for the reasons set forth above.

- Page 49, line 9 to page 50, line 5.  Similarly, this designation is contingent upon the ruling of the court with respect to the defendant's designations of Mr. Salva's testimony.

- Page 55, line 2 to page 56, line 7.  This designation is also contingent upon the ruling of the court with respect to the defendant's designations of Mr. Salva's testimony.

- Page 56, line 18 to page 57, line 8.  Designated pursuant to the same contingency.

- Page 86, line 22 to page 87, line 5.  The same contingency with respect to this designation.

- Page 89, line 18 to page 91, line 15. Designation pursuant to the remarks above.

- Page 102, line 9 to 20;

- Page 104, line 6 to 8

- Page 104, line 19 to page 105, line 8;  page line 21 to 23.

- Page 106, line 3 (starting with second word) to line 11

- Page 106, line 17 to page 107, line 5.

- Page 107, line 17 to 24

- Page 108, line 9-13

- Page 109, line 14 to 16; line 25 to page 110, line 7.

**B. Defendants**

**(1) Defendants' witnesses**

The witnesses who will be presented by defendants are as follows:

1.  Haygo Demir

2.  Rachel Doherty

3.  Chantel Romeu

4.  Krystal Sweeny Williams

5.  Alia Madelaire

6.  Tiffany Cox

7.  Christina Cox

8.  James DeMattei

9.  Allen Klein

10. Joe Salva

11. Sanford B. Horwitz, CPA

12. Jacqueline Tanis Vidibor

13. Nicholas Burd

14. Vijay Khemlani

15. Adesh Baharani

16. Ajay Baharani

17. Defendants reserve the right to call any witness named by the Plaintiff.

The specifics regarding the testimonies of these witnesses are set forth below:

o **Haygo Demir** - He is the President of DGI Florida. He will provide testimony relating to DGI Florida's sales, financial conditions, and hiring and firing processes, as well as specific information related to Arroyo's hiring, termination, and employment history with DGI Florida. His address and telephone number are: 420 Lincoln Road #240 Miami Beach, FL 33139, (305) 759-2830.

o **Rachel Doherty**– She is the Vice President of Operations for DGI Florida and as such she has knowledge of DGI's financial conditions and termination decisions, as well as specific knowledge related to Arroyo's employment with DGI Florida. Her address and telephone number are: 420 Lincoln Road #240 Miami Beach, FL 33139, (305) 759-2830.

o **Chantel Romeu-** She is a current employee at DGI and was Arroyo's Territory Assistant Chantel Romeu. Her employment was terminated in early 2009 and was re-hired recently.  She will testify about taking over part of Ms. Arroyo's territory, working as Ms. Arroyo's Territory Assistant, and her termination from DGI.  Her address and telephone number are: 420 Lincoln Road #240 Miami Beach, FL 33139, (305) 759-2830.

110

- o **Krystal Williams Sweeney** - She was Arroyo's direct manager before Rodriguez was hired. Her address and telephone number are: 1920 Younge Street, Suite 200, Toronto, Ontario Canada M4S3E2, 416-557-5797.

- o **Alia Madelaire** - Current employee at DGI Florida. Madelaire is pregnant and can testify as to DGI Florida's employment practices related to pregnancy. Her address and telephone number are: 420 Lincoln Road #240 Miami Beach, FL 33139, (305) 759-2830.

- o **Tiffany Cox -** Current employee at DGI Florida. She will testify about her employment with DGI Florida and the financial hardship that DGI was suffering in 2008. Her address and telephone number are: 420 Lincoln Road #240 Miami Beach, FL 33139, (305) 759-2830.

- o **Christina Cox -** Former DGI Florida employee who was terminated by DGI Florida during the time of financial hardship in 2008. She will testify about her employment with DGI Florida and its handling of her termination. Her address and telephone number are: 420 Lincoln Road #240 Miami Beach, FL 33139, (305) 759-2830.

Christina Cox Deposition Designation
7:13 – 7:24
12:2 – 13:5
13:22 – 16:12
24:20 – 27:8
28:15 – 30:9
31:5 – 32:19

111

33:10 – 35:4

49:22 – 50:7

50:16 – 51:5

56:1 – 57:8

60:8 – 60:18

61:10 – 62:7

62:23 – 66:1

66:9 – 68:6

68:11 – 68:21

70:2 – 71:7

71:10 – 72:21

74:3 – 74:22

o **James DeMattei -** Mr. Demattei is a colleague in the jewelry industry.  Mr. Demattei

will testify about a loan that he provided to Mr. Demir in 2008 and will testify about

the state of the jewelry industry in 2008 and the effect that the financial crisis had on

the jewelry industry during that time period. His address is 10 East 38 Street, New

York, NY 10016,  212-696-1881 or 917- 941-7358.

James DeMattei Deposition Designation
6:3 – 6:4

7:20 – 7:22

8:6 – 10:1

10:4 -  10:10

10:21 – 11:22

12:4 – 13:21

13:23 – 14:5

14:8 – 15:7

15:15 – 16:9

16:15 – 17:25

18:8 – 20:14

22:7 – 22:25

23:6 – 23:22

24:7 – 27:19

39:4 – 39:21

40:6 – 40:22

41:10 – 41:15

41:19 – 41:24

42:8 – 42:10

42:18 – 42:25

43:5 - 43:17

43:24 – 44:8

o **Allen Klein** – Colleague from the jewelry industry and owner of Eastern

Merchandise Co., Inc. He will testify about a loan that he provided to Mr. Demir in

2008 and information related to the state of the jewelry industry in 2008 and the

effect that the financial crisis had on the jewelry industry during that time period. His

address and telephone numbers are: 27101 Second Ave, Seattle WA 98121, (206)

448-4466, (206) 953-2252.

Allen Klein Deposition Designation

4:14 – 4:15

5:20 – 6:4

6:21 – 8:13

8:20 – 13:3

13:12 – 15:6

17:4 – 18:14

38:11 – 38:21

40:1 -  40:9

o **Joe Salva** - Colleague from the jewelry industry and owner of The Hook Company. He will testify about a loan that he provided to Mr. Demir for a booth for DGI at a jewelry show in 2008 and information related to the state of the jewelry industry in 2008 and the effect that the financial crisis had on the jewelry industry during that time period. His address and telephone numbers are: Ligon Mill Business Center, 2012 South Main Street Suite 520, Wake Forest, NC 27587, 919-523-1743.

Joe Salva Deposition Designation
3:14 – 3:16
5:22 – 6:18
6:22 – 7:14
10:2 – 10:15
15:3 – 15:15
16:2 – 16:18
18:2 – 19:4
28:17 – 31:25
32:15 – 34:5

o **Jacqueline Tanis Vidibor** - Former DGI Florida employee who was terminated by DGI Florida during the time of financial hardship in 2008. She will testify about her employment with DGI Florida, the financial difficulties that the company suffered during that time period, and its handling of her termination. Her last known address

114

and telephone number are: Island Companies Ltd., PO Box 10063, Grand Cayman

KY1-1001 Cayman Islands (345) -516-5354.

o  **Sanford B. Horowitz, CPA -** He is DGI Florida's accountant, employed at the

Miami accounting firm, Goldstein, Schechter, Koch, P.A. His address and telephone

number are: 420 Lincoln Road #240 Miami Beach, FL 33139, (305) 759-2830.

Sanford Horwitz Deposition Desgination
4:14 – 4:24
6:23 – 7:6
64:7 – 65:14
101:3 – 103:5
103:11 – 105:25
106:7 – 107:1
107:6 – 108:6
109:7 – 113:3
113:5 – 114:8
114:11 – 114:15
115:1 – 115:23

o  **Nicholas Burd-** Mr. Burd is an accountant at Chaplin & Burd, C.A.'s, LLP, the

accountant firm that prepares the tax returns for DGI Canada.  Mr. Burd prepared

DGI Canada's tax returns, has knowledge of the financial issues that were facing the

company before, during and after the time of Ms. Arroyo's termination, will

authenticate the tax returns and testify about what is contained within the tax returns

of DGI Canada as they relate to DGI's financial condition.  His address is Chaplin

& Burd, C.A.'s, LLP, 501-55 Town Centre Court, Scarborough, ON M1P4X4, 416-

290-6455

<u>Nicholas Burd Deposition Designation</u>
6:5 – 6:8
8:25 – 9:14
10:18 – 10:19
11:14 – 12:6
12:17 – 12:25
18:24 – 19:2
19:14 -19:19
20:3 -20:10
20:23 – 26:25
27:16 – 28:8
29:9 – 30:11
31:7 – 32:25
33:6 – 33:19
34:13 – 42:4
42:7 – 42:16
43:17 – 44:14
44:22 – 45:9
45:19 – 47:6
60:15 – 61:8

o **Adesh Baharani and/or Ajay Baharani** – AdeshBaharani and/or Ajay Baharani

may provide rebuttal testimony to some of the testimony that may be provided by

Ilianny Mera, namely that she had dinners with them and Mr. Demir where Mr.

Demir made certain statements about pregnant women working at DGI.

116

o **Vijay Khemlani -** Owner of Blue Diamond in Old San Juan who will testify about his experience with Arroyo as a Territory Manager, and his complaints that she was late for and did not show up for meetings. His address and telephone number are: 202 Calle Fortaleza, Old San Juan, PR 00901, 787-721-0855, 787-376-7890.

> Vijay Khemlani Deposition Designation
> 10:23 – 10:24
> 11:3 – 11:9
> 13:7 – 13:13
> 22:3 – 23:1
> 23:10 – 24:6
> 25:5 – 25:17
> 27:4 – 27:11
> 34:5 – 34:20
> 35:21 – 35:37
> 40:24 – 41:7
> 42:6 – 43:3
> 45:18 - 48:13

Defendants expressly reserve the right to call as a witness any of the witnesses announced by the Plaintiff.

**(2) Defendants' objections and counter-designations to plaintiff's witnesses**

• **María Cabiya**: This is a video-taped deposition.  Plaintiff has designated the entire deposition.  Defendants object to the entirety of this witness's testimony, which they understand to be irrelevant and collateral.

Independently of the above, during the depositions, both parties preserved objections and reserved others for trial.  In the event that the testimony is allowed, the parties have agreed to address with the Magistrate Judge the most adequate manner to deal with objections to this deposition, in order to present this witness in a reasonable and effective way during trial by jury.

- **Nicholas Burd - defendants' objections to plaintiff's designations**

    - page 53, lines 6 -20 (HEARSAY)

    - page 53, line 24 to page 54, line 8 (HEARSAY)

    - page 71, lines 9 to 22 (HEARSAY)

- **Tiffany Cox - defendants' objections to plaintiff's designations**

    - page 19, line 22 to page 20, line 9  (RELEVANCE)

    - page 20, line 21 to page 21, line 11 (RELEVANCE)

    - page 21, line 21 to page 22, line 3 (RELEVANCE)

- **Ilianny Mera - defendants' objections to plaintiff's designations**

**Ilianny Mera telephone deposition, January 19, 2011**

**Examination by atty. Berkan**

118

- page 21 (second word of line 2) to page 22, line 15

    (RELEVANCE, HEARSAY, SPECULATION)

- page 30, lines 2-7; lines 11-15; lines 18-25

    (RELEVANCE)

- page 31, lines 4 to 6; lines 25 to page 32, line 9

    (RELEVANCE)

- page 32, line 12 (second sentence) to p. 33, line 9

    (RELEVANCE)

- page 34, line 2 to page 35, line 11

    (RELEVANCE)

- page 35, line 23 to page 36, line 11

    (RELEVANCE)

- page 40, lines 11-15; line 23 to page 41, line 2; line 19 to page 42, line 8

    (RELEVANCE, SPECULATION, FOUNDATION)

**Examination by atty. Cotzen**

- page 72, lines 7 to 25

    (RELEVANCE)

- page 89, line 11 to page 90, line 19

    (FOUNDATION, HEARSAY)

119

- page 92, line 24 to page 93, line 25

(RELEVANCE, FOUNDATION, HEARSAY, INABILITY TO DEPOSE OTHERS)

**Deposition of Ilianny Mera by telephone, April 4, 2011**

**Examination by Mr. Cotzen**

- page 49, lines 2-15

(RELEVANCE)

- page 50, lines 11 -14

(RELEVANCE, FOUNDATION)

- page 67, line 25 to page 68, line 16

(RELEVANCE, FOUNDATION, HEARSAY, INABILITY TO DEPOSE OTHERS)

- page 69, lines 6 to 23

(RELEVANCE, FOUNDATION, HEARSAY, INABILITY TO DEPOSE OTHERS)

- page 76, line 5-15

(RELEVANCE, FOUNDATION)

- page 78, line 2 (mid-line) to 7

(RELEVANCE, FOUNDATION; INCOMPLETE QUESTION AND ANSWER)

**Examination by Ms. Berkan**

- page 94, line 22 to page 95, line 3

(INCOMPLETE TESTIMONY/DOCTRINE OF COMPLETENESS; MUST BE THROUGH PAGE 95, LINE 9)

- page 102, line 20 to page 103, line 22

(OBJECTION - DESIGNATION DOES NOT MAKE SENSE; NOT COMPLETE QUESTIONS AND ANSWERS)

- page 104, line 4 (last word) to line 10

(OBJECTION - DESIGNATION DOES NOT MAKE SENSE; NOT COMPLETE QUESTIONS AND ANSWERS)

**Telephonic Deposition on April 11, 2011**

**Examination by Mr. Cotzen**

- page 23, line 4; line 15 to page 25, line 2

(RELEVANCE, FOUNDATION, HEARSAY, INABILITY TO DEPOSE OTHERS)

- page 30, line 3 to page 31, line 23

(RELEVANCE, FOUNDATION, HEARSAY, INABILITY TO DEPOSE OTHERS)

**Defendants' counter-designations of Ilianny Mera's deposition**

**Telephone deposition - Jan. 19, 2011**

11:18 - 11:25
12:20 - 13:19
14:9 - 14:15
14:21 - 15:8

17:16 - 17:25

49:21 - 50:13

50:16 - 52:12

52:15 - 52:16

53:5 - 53:11

53:18 - 53:22

56:13 - 56:21

57:19 - 58:12

59:2 - 59:14

60:21 - 62:3

62:10 - 63:3

63:4 - 63:9

63:10 - 63:16

63:24 - 65:14

66:9 - 67:13

71:4 - 71:18

74:15 - 74:25

77:24 - 78:6

78:13 - 78:19

82:15 - 82:18

82:22 - 83:8

83:20 - 85:22

95:15 - 95:17

95:21 - 95:23

**Telephone deposition of Ilianny Mera April 4, 2011**

7:11 - 8:12

16:13 - 16:20

16:25 - 19:6

22:8 - 22:11

22:19 - 23:16

24:7 - 24:25

122

25:6 - 25:15

26:23 - 27:4

30:9 - 31:1

31:15 - 32:17

33:2 - 33:5

34:18 - 35:11

36:9 - 37:25

38:20 - 38:22

39:22 - 39:23

40:4 - 40:21

40:24 - 41:22

42:2 - 42:14

43:22 - 44:16

45:5 - 45:9

45:20 - 45:25

46:11 - 46:13

47:6 - 47:12

47:19 - 48:4

54:7 - 57:12

63:4 - 63:15

67:25 - 68:10

70:3 - 71:15

72:3 - 72:13

75:8 - 75:22

80:14 - 80:22

81:3 - 83:1

83:23 - 85:3

90:21 - 91:5

99:15 - 99:24

**Telephone deposition, April 11, 2011**

Page 37 line 22 - Page 38 line 2

123

Page 52 line 1 - Page 52 line 14

- **Defendants' Objections to plaintiff's counter designations with respect to Joe Salva**

    - Page 47, line 2 -25; page 48, line 9 - page 49, line 5.

        **Objection - questions out of context**

    - Page 86, line 22 to page 87, line 5.

        **Objection - relevance**

    - Page 102, line 9 to 20

        **Objection - no answer to question**

    - Page 106, line 3 (starting with second word) to line 11

        **Objection - incomplete testimony**

6. **DOCUMENTS AND ITEMS EACH PARTY INTENDS TO OFFER AS EVIDENCE AT TRIAL**

   A. **Plaintiff**

   i. **Those for which admissibility is stipulated:**

   1**.** Demir Group International, Inc, (Florida) - Corporate Resolution

   2. Demir Group International, Inc (Canada) - Corporate Resolution

   3. Email Arroyo to Mera, Sept. 23, 2007 re Hello

   124

4. Email exchange between Williams and Arroyo, Nov. 24th to Nov. 27th re Eunice

5. Email Demir to Mera and Arroyo, Dec. 2, 2007 re Xmas Dinner

6. Email Williams to Arroyo, Dec. 11, 2007

7. Email from Demir to Arroyo, Dec. 12, 2007 re maternity leave

8. Email January 1, 2008 from Demir to Staff re State of the Union

9. Email exchange, January 7th and January 9, 2008, Williams and Arroyo re Barbados Trip

10. Email exchange January20 and 21, 2008 between Williams and Arroyo re Maternity Leave

11. Email Demir to Arroyo, March 10, 2008 re Natalio Barquett

12. Email Doherty to Arroyo, March 26, 2008 and response, March 27, 2008 re Eunice Arroyo-Personal

13. Email Arroyo to Romeu, April 20, 2008, re Eunice's Territory

14. Email Taylor to Arroyo, April 22, 2008, re Expenses and Bonus

15. Email May 21, 2008, Demir to Arroyo re Eunice bonus #'s

16. Email Demir to staff, June 7, 2008 re Vegas 08 Order Log

17. Email exchange, Demir and Arroyo, June 13, 2009 re Please call me

18. Email Arroyo to Romeu, July 2, 2008 re Eunice

19. Email Rodríguez to Arroyo, August 4, 2008 re Few Things

125

20. Email Arroyo to Demir, September 19, 2009 re Eunice Report

21. Email, Doherty to Arroyo, December 11, 2008

22. Letter Demir to Arroyo, December 17, 2008 re Eunice Arroyo

23. Expense Reimbursement, December 19, 2008

24. Email from Arroyo to Demir, Dec. 30, 2008

25. Records from Hato Rey Medical Gastro, CSP

26. Check, June 8, 2009, Xmas Bonus

27. Check, June 12, 2009, Sales Bonus, 2007

28. Admissions by Defendants (facts admitted will be read to jury)

29. Supplemental Interrogatory Answers, Sept. 14, 2010

30. Responses by Arroyo and/or her attorneys re Florida demand for return of jewelry


**ii. <u>Those for which admissibility is contested, with authority for the</u> <u>objections</u>:**

**Identification #1**. Composite Exhibit - Emails during plaintiff's maternity leave - May 15, 2008; May 16, 2009;  May 20, 2008; two from May 23, 2008; email stream ending on May 23, re Bared, Jr. May 27, 2008; June 4, 2008; June 5, 2008; June 9, 2008; June 12, 2008, three from June 13, 2008; three from June 19, 2008; three from June 20, 2008;  email stream ending in June 25, 2008; June 29, 2008.

        **Objection: Unclear as to relevancy without evidentiary context; authenticity;**

**hearsay**

**Identification #2:**  Email Holsapple to Arroyo, June 19, 2008

>    **Objection:  Hearsay; relevance**

**Identification #3**: Three emails, Doherty to Arroyo, July 2, 2008 re maternity leave

>    **Objection: Relevance**

**Identification #4:**  Email Arroyo to Doherty, July 2, 2008, re Maternity Leave

>    **Objection: Relevance**

**Identification #5**:  Email Doherty to Williams and Demir; Williams to Demir and Doherty, re Eunice, July 3, 2008

>    **Objection: Unclear as to relevance without evidentiary context**

**Identification #6:**  Email from Demir to employees October 4, 2008, with attachment by Doherty, Sept. 30, 2008, re DGI Head Office.

>    **Objection: Relevance**

**Identification #7:** Email B. Rodríguez to Demir and Doherty, October 11, 2008

>    **Objection: Hearsay**

**Identification #8**: Email Rodríguez to Arroyo, December 19, 2008, re Eunice

>    **Objection: Hearsay**

**Identification #9**: Email from Demir to staff, June 15, 2009, re Eunice

>    **Objection:  Attorney/Client Privilege and Work Product (inadvertent**

disclosure); Relevance.

**Identification #10:**  Documents reflecting plaintiff's job search.

     **Objection:  Incomplete without resume that was supposedly attached.**

**Identification #11:**  Documents from Case No. 10-05678:  April 9 letter from Waldman to Cotzen; January 21, 2001, Order granting Motion to Dismiss; March 14, 2011, Order on Motion for Attorneys Fees and Costs.

     **Objection:  Irrelevant and objected to pursuant to Rules 402 and 403.**


**B. <u>Defendants</u>**

     **i. <u>Those for which admissibility is stipulated:</u>**

        A.      DGI 2005 US Corporate Tax Returns

        B.      DGI 2005 Canada Tax Returns

        C.      DGI 2006 US Corporate Tax Returns

        D.      DGI 2006 Canada Tax Returns

        E.      November 10, 2006- Email from Eunice to Rachel, Subject- Vacation Payment

        F.      DGI 2007 US Corporate Tax Returns

        G.      DGI 2007 Canada Tax Returns

        H.      February 1, 2007- Email from H. Demir to Krystal, et al. Subject- New

territory Assignments

I.     April 18, 2007- Email from Eunice Arroyo to Rachel D. Subject- Re: Cash Expense Payment March

J.     July 16, 2007- Email from Eunice Arroyo to Rachel D. Subject- Expenses Payment

K.     July 20, 2007- Email from Rachel D. to Eunice Arroyo. Subject – Re: Expenses Payment

L.     August 13, 2007- Email from Blanquita to Eunice Arroyo, et al. Subject- Re: Vacation Request.

M.     August 27, 2007- Email from Eunice Arroyo to Rachel D. et al. Subject- Eunice Expense Report

N.     November 27, 2007- Email from Krystal W. to Eunice Arroyo, et al. Subject- Re: Eunice

O.     November 28, 2007- Email from Krystal W. to Eunice Arroyo, et al. Subject- Territory Questions

P.     November 30, 2007- Email from Haygo re: new positions in DGI

Q.     December  12, 2007- Email from Eunice Arroyo to Rachel D. Subject- Expenses Payment

R.     December 12, 2007- Email from Eunice to Krystal W. et al. Subject- Maternity Leave

129

S.      December 18, 2007- Email from Eunice Arroyo to Rachel D. Subject Re:
        Expenses

T.      December 20, 2007- Email from Eunice Arroyo to Rachel D. Subject- Re:
        Christmas Bonus

U.      2008 DGI US Corporate Tax Returns

V.      2008 DGI Canada Tax Returns

W.      January 14, 2008 Email from Eunice to DGI with little belly pictures

X.      January 21, 2008- Email from Krystal W. to Eunice Arroyo. Subject- Re:
        Maternity Leave

Y.      March 4, 2008 Emails between Arroyo and Chantel re: PR Trip

Z.      March 26, 2008 emails Arroyo thanking DGI for baby gifts

AA.     April 16, 2008 email from Eunice to DGI with big belly picturesApril 21,
        2008 emails from Eunice to Chantel with Territory information

BB.     April 30, 2008 email from Rachel to Eunice wishing her luck

CC.     May 2008 emails between Eunice and Ran Re:PST- reorders

DD.     May 5, 2008 emails to DGI with Arroyo's newborn's pictures

EE.     June 19, 2008 email from Eunice to Haygo re: giving territories to Chantel

FF.     July 2, 2008 email from Rachel re: maternity leave pay

GG.     July 2, 2008 email from Rachel re: maternity leave pay

130

HH.   July 7, 2008 email announcing Eunice's return from maternity leave

II.   August 11, 2008 Eunice gastro records. **Unclear as to relevancy without evidentiary context.  Authenticity.  Possible discovery violation.**

JJ.   September 8, 2008 email from Blanca to Arroyo re: territory reports

KK.   September 13, 2008 email from Haygo to Eunice re: status updates

LL.   September 18, 2008 email from Blanca to Eunice re: Territory reports

MM.   October 2008 Eastern Merchandise Statement

NN.   October 14, 2008 DGI sales meeting itinerary

OO.   October 16, 2008 email from Eunice re: late September payroll

PP.   October 22, 2008 emails between Blanca and Eunice re: termination instructions

QQ.   November 4, 2008 email from Blanca to Arroyo re: Consejo

RR.   November 14, 2008 Arroyo EEOC Claim

SS.   December 11, 2008 email from Rachel to Arroyo re: expenses owed

TT.   December 30, 2008 email from Arroyo to Haygo Re: DGI's December 19, 2008 letter

UU.   June 24, 2009 Schlesinger & Cotzen Demand Letter to Arroyo

VV.   Copies of cashed checked payable to Arroyo from DGI post termination

WW.   February 15, 2010 Pandora employment offer to Eunice

XX.    August 6, 2010 Interrogatories responses from Eunice Arroyo

YY.    Emails from Eunice transmitted resume

**ii. <u>Those for which admissibility is contested, with authority for the <u>objections</u>:</u>**

**Identification 1:**   July 27, 2006- Email from Eunice Arroyo to Haygo Demir. Subject- Jaqueline Berrios Resume.   **Unclear as to relevancy without evidentiary context.**

**Identification 2:**   November 30, 2006- Email from Blanca to Rachel. Subject- Eunice **Unclear as to relevancy without evidentiary context.**

**Identification 3:**    February 8, 2007- From Christina Cox to Eunice Arroyo. Subject- Bared.  **Unclear as to relevancy without evidentiary context.**

**Identification 4:**    March 2007-December 2008 Calendar. **Unclear as to relevancy without evidentiary context.**

**Identification 5:**   March 7, 2007- From Yolanda Fontanez to Eunice and Christina. No Subject. **Unclear as to relevancy without evidentiary context.**

**Identification 6:**    May 4, 2007- Email from Felix Bared to Eunice Arroyo, et al. Subject –Re: Bared Judith Ripka.  **Unclear as to relevancy without evidentiary context.**

**Identification 7:**    July 24, 2007- Email from Eunice Arroyo to Rachel D. Subject- Eunice mortgage loan. **Unclear as to relevancy without**

132

evidentiary context

**Identification 8:**   September 12, 2007- Email from Chantel Romeu to Alia Madelaire, et al. Subject- September ship assignments. **Unclear as to relevancy without evidentiary context. Authentication, hearsay, lack of proper foundation**

**Identification 9:**   September 23, 2007- Email from Eunice Arroyo to Blanquita. Subject- Re:Fwd: Hello. **Unclear as to relevancy without evidentiary context.**

**Identification 10:**   October 19, 2007- Email from Eunice Arroyo to Rachel D. et al. Subject- Re: NOA Samples. **Unclear as to relevancy without evidentiary context.**

**Identification 11:**   October 23, 2007- Email from Eunice Arroyo to Alia Madelaire, et al. Subject- NOA Watch Sample Eunice. **Unclear as to relevancy without evidentiary context.**

**Identification 12:**   November 24, 2007-Email from Vijay Khemlani to Haygo Demir, et al. Subject- RE: Judith Ripka. **Unclear as to relevancy without evidentiary context.**

**Identification 13:**   November 24, 2007- Email from Haygo Demir to Eunice Arroyo, et al. Subject- Fwd: Judith Ripka. **Unclear as to relevancy without evidentiary context.**

**Identification 14:**   November 24, 2007- Email from Eunice Arroyo to Haygo Demir, et

133

al. Subject- FW: Sales Reports. **Unclear as to relevancy without evidentiary context.**

**Identification 15:**     October 5, 2007- Email from Beth Abbott to Eunice Arroyo. Subject – Re: Visit to Antigua. **Unclear as to relevancy without evidentiary context.**

**Identification 16:**     2008 DGI state of the union - **Plaintiff does not know which document this is. If it is the document "The future is so bright," she has no objection. If not, she reserves her right to object to this document.**

**Identification 17:**     2008 DGI Restatement of Results of Operations. **Authentication, hearsay, lack of proper foundation.**

**Identification 18:**     January 3, 2008- Email from Iris to Blanquita, et al. Subject- Updated Territory Listings. **Unclear as to relevancy without evidentiary context. Authentication, hearsay, lack of proper foundation**

**Identification 19:**     January 3, 2008- Email from Krystal W. to Eunice Arroyo, et al. Subject- FW: Territory Questions. **Unclear as to relevance without evidentiary contexts.**

**Identification 20:**     January 8, 2008- Email from Eunice Arroyo to Krystal W. Subject- Re: Territory Questions. **Unclear as to relevancy without evidentiary context.**

**Identification 21:**   January 11, 2008- Email from Haygo Demir to Chantel Romeu, et al. Subject- Fw: Casa Diamante Order. **Unclear as to relevancy without evidentiary context.**

**Identification 22:**   January 18, 2008- Email from Eunice Arroyo to Krystal W. Subject- Fw: Territory Forecasts **Unclear as to relevancy without evidentiary context.**

**Identification 23:**   January 21, 2008- Email from Eunice Arroyo to Haygo Demir. Subject- RE; Antigua. **Unclear as to relevancy without evidentiary context.**

**Identification 24:**   January 22, 2008- Email from Haygo Demir to Eunice Arroyo. Subject – Fwd: Antigua. **Unclear as to relevancy without evidentiary context.**

**Identification 25:**   February 6, 2008- Email from Eunice Arroyo to Rachel D. Subject- Re: Ishanna. **Unclear as to relevancy without evidentiary context.**

**Identification 26:**   February 18, 2008- Email from Eunice Arroyo to Ilianny Mera. Subject- Fw: Questions. **Unclear as to relevancy without evidentiary context.**

**Identification 27:**   February 19, 2008- Email from Eunice Arroyo to Krystal W. Subject- Re: Barbados **Unclear as to relevancy without evidentiary context.**

**Identification 28:**     February 22, 2008 email from Krystal to Eunice with questions and responses from Eunice. **Unclear as to relevancy without evidentiary context.**

**Identification 29:**     March 10, 2008 email from Haygo to Arroyo Re: Natalio Barquette **Unclear as to relevancy without evidentiary context.**

**Identification 30:**     April 11, 2008 email from Ilianny to Eunice re: Comunicate. **Unclear as to relevancy without evidentiary context.**

**Identification 31:**     April 16, 2008 emails from Eunice to Rachel re: needing money. **Unclear as to relevancy without evidentiary context. Objection to characterization of exhibit. Authenticity.**

**Identification 32:**     April 16, 2008 email with sales chart comparisons of Eunice's territories. **Unclear as to relevancy without evidentiary context. Authenticity.**

**Identification 33:**     April 20, 2008 email from Eunice to Bernard Francis**. Unclear as to relevancy without evidentiary context.**

**Identification 34:**     July 1, 2008 email from Ali re: customer complaint about Eunice **Unclear as to relevancy without evidentiary context. Hearsay. Authenticity. Lack of proper foundation.**

**Identification 35:**     July 2, 2008 email from Eunice to Chantel re: Eunice. **Unclear as to relevancy without evidentiary context. Authenticity.**

**Identification 36:**   July 2, 2008 emails re: Bared issues. **Unclear as to relevancy without evidentiary context.**

**Identification 37:**   July 14, 2008 email re: late expenses payment. **Unclear as to relevancy without evidentiary context. Authenticity**

**Identification 38:**   July 22, 2008 email re: Eunice loan consolidation. **Unclear as to relevancy without evidentiary context.**

**Identification 39:**   July 28, 2008 email re: late expenses payment. **Unclear as to relevancy without evidentiary context.**

**Identification 40:**   August 9, 2008 email re: late report. **Unclear as to relevancy without evidentiary context. Authenticity.**

**Identification 41:**   August 19, 2008 approval letter from Medical Card System, Inc. approving Endoscopy. **Unclear as to relevancy without evidentiary context. Authenticity.**

**Identification 42:**   September 5, 2008 email from Blanca to Arroyo re: mama **Unclear as to relevancy without evidentiary context.**

**Identification 43:**   October 8, 2008 email from Maria Jose to Eunice re: lack of communication. **Unclear as to relevancy without evidentiary context.**

**Identification 44:**   October 11, 2008 email from Eunice re: Resume. **Authenticity**

**Identification 45:**   October 2008 Emails re: late payroll. **Authenticity**, **hearsay.**

137

**Identification 46:**    2008 Emails re: when Arroyo will take maternity leave. **Authenticity.**

**Identification 47:**    December 4, 2008 email from Arroyo re: Centennial termination and merger. **Authenticity**

**Identification 48:**    December 16, 2008 Active Capital Loan documents. **Authenticity. Relevance. Hearsay.**

**Identification 49:**    DGI 2009 US Corporate Tax Returns. **Relevance, Authenticity.**

**Identification 50:**    2009 DGI Restatement of Results of Operations. **Authenticity. Post-litigation document. Improper Summary. Relevance.**

**Identification 51:**    DGI 2009 State of the Union Email. **Relevance. Authenticity.**

**Identification 52:**    March 2009 emails from Haygo with responses from Blanca. **Unclear as to relevancy without evidentiary context. Authenticity.**

**Identification 53:**    March 3, 2009 Haygo's 2nd State of the Union Email. **Relevance. Authenticity.**

**Identification 54:**    May 21, 2009 email from Krystal to Haygo re: Eunice's Analysis. **Authenticity, relevance, post-litigation created documents.**

**Identification 55:**    June 2009 emails re: Eunice's accounts going to collections. **Authenticity, relevance, post-litigation created documents.**

**Identification 56:**    August 19, 2008 email from Blanca to Jim DeMattei re: Eunice toy

watch accounts. **Unclear as to relevancy without evidentiary context. Hearsay. Authenticity. Improper foundation.**

**Identification 57:** July and August 2009 letters from Hector Robles re: loan modifications. **Relevance, hearsay, authenticity.**

**Identification 58**: September 9, 2009 email from Blanca re: Issues with Eunice giving wrong info. **Relevance, hearsay, authenticity, improper foundation, post-litigation created document.**

**Identification 59:** 2006-2008 chart of shipped orders for Arroyo's territories. **Authenticity, hearsay, post-hoc litigation created documents, lack of proper foundation, improper summary.**

**Identification 60:** DGI employee listing 2006-2008. **Authenticity, hearsay, post-hoc litigation created documents, lack of proper foundation, improper summary.**

**Identification 61:** DGI Employee contact list 2004-2008. **Authenticity, hearsay, post-hoc litigation created documents, lack of proper foundation, improper summary.**

**Identification 62:** DGI total gross sales chart from 2005-2008 by Territory. **Authenticity, hearsay, post-hoc litigation created documents, lack of proper foundation, improper summary.**

**Identification 63:** TM Bonus chart 2005-2009. **Authenticity, hearsay, post-hoc litigation created documents, lack of proper foundation,**

139

**improper summary.**

**Identification 64**:       July 2010 Active Capital Invoice**.     Authenticity, relevance, hearsay, lack of proper foundation.**

**Identification 65:**       DGI Pie charts and back up 2007-2008. **Authenticity, hearsay, post-hoc litigation created documents, lack of proper foundation, improper summaries.**

**Identification 66:**       DGI Financial Statements October 31, 2004. **Authenticity, hearsay, post-hoc litigation created documents, lack of proper foundation, improper summaries, relevance.**

**Identification 67:**       DGI Financial Statements October 31, 2005. **Authenticity, hearsay, post-hoc litigation created documents, lack of proper foundation, improper summaries, relevance.**

**Identification 68:**       DGI Financial Statements October 31, 2006. **Authenticity, hearsay, post-hoc litigation created documents, lack of proper foundation, improper summaries, relevance.**

**Identification 69:**       DGI Financial Statements October 31, 2007. **Authenticity, hearsay, post-hoc litigation created documents, lack of proper foundation, improper summaries, relevance.**

**Identification 70:**       Checks written by Eunice. **Impossible to determine relevance. Impossible to identify.  Need evidentiary context.**

**Identification 71:**     Viewpoint Documents. **Authenticity, hearsay, lack of proper foundation, relevance.**

**Identification 72**      Eunice Payroll detail. **Authenticity.**

**Identification 73:**     DGI list of TMs and Territories. **Authenticity, hearsay, lack of proper foundation, relevance, litigation documents, improper summaries.**

**Identification 74**      DGI Calendars. **Authenticity, relevance.**

**Identification 75**      Hector Robles Car Insurance Policy information. **Authenticity, relevance, hearsay, lack of proper foundation.**

**Identification 76:**     Joe Salva Account Statement. **Relevance, authenticity, hearsay, lack of proper foundation.**

## C. JOINT EXHIBITS

I. Email from Demir to Staff, Feb. 1, 2007 re New Territory Assignments

II. Email from Doherty to Demir, May 17, 2007 re New Office

III. Email from Doherty to Arroyo, July 9, 2007 re Salary

IV. September 23, 2007 emails between Eunice and Haygo Re: Hello

V.  Email Arroyo to Williams, Dec. 12, 2007

VI.  December 31, 2007- Letter from Haygo Demir to DGI Staff. Subject- State of the Union - The Future is so Bright

VII. Email Arroyo to Demir, March 6, 2008, and response March 16, 2008 re Eunice Arroyo- Personal

VIII.    Email Ng to Arroyo, June 9, 2008 re DGI Sales YTD Comparison

IX.   Email Arroyo to Demir, September 19, 2008 re HOFU Homework

X.   Email from Arroyo to Demir, Nov. 4, 2009 re Eunice Arroyo

XI.    Letter Demir to Arroyo, December 19, 2008

XII.    January 27, 2009 letter from DGI to Arroyo


## 7.    EXPERT WITNESSES AND BRIEF, GENERAL STATEMENT AS TO EACH

## A. Plaintiff

**None**

B. **Defendants**

   **None**

8.    **CLAIMS ABANDONED OR DEFENSES WAIVED OR ABANDONED**

   A. **Plaintiff**

   None

   B. **Defendants**

   None

9.  **PENDING MOTIONS**

   A. **Plaintiff**

   None

   B. **Defendants**

   None

10. **ESTIMATED DAYS REQUIRED FOR TRIAL FOR EACH PARTY**

   A. **Plaintiff**

   Three days of testimony, depending on length of cross-examination

143

B. **Defendants**

Three days of testimony, depending on length of cross-examination

11. **DATE OF TRIAL AND POTENTIAL PROBLEMS OF WITNESS OR ATTORNEY ATTENDANCE AT TRIAL**
  A. **Plaintiff**

Trial is set to commence on December 12, 2011.  Plaintiff's counsel, Judith Berkan and Mary Jo Méndez, have cleared their calendar for a week and will be able to attend.

B. **Defendants**

Trial is set to commence on December 12, 2011.  Defendants' counsel Michael J. Schlesinger and local counsel (María Judith Marchand and/or Juan Rivera Font) have cleared their calendar for a week and will be able to attend.

12. **TRIAL BY MAGISTRATE**

This case will be tried by a Magistrate Judge

13. **OTHER MATTERS**

A. **Plaintiff**

i. **Depositions**: Each of the parties will be using depositions as part of the case in chief.  It is important for the parties and the court to decide before trial begins how the presentation of depositions will be completed, including designations, objections and form of presentation (audio,

144

video, in-court interrogation, paper transcript, etc.)  In particular, there is one lengthy video-taped depostion (María Cabiya) which plaintiff has designated in its entirety and to which defendants have objected (in its entirety, or in the alternative, to particular parts).  To facilitate presentation, plaintiff believes that this matter should be addressed prior to the start of trial, in order to edit the video-tape if need be.

### ii. Counter-designations of depositions should be limited to the scope of direct unless separately presented during the opposing parties' case in chief

Although it is certainly true that counter-designations are allowed as to any deposition testimony submitted as testimony at trial, the designations should be limited to the scope of the direct testimony presented by the party offering the witness.  If the defendants choose to make counter-designations in response to one of the depositions designated by the plaintiff, they should be limited to the scope of the examination presented by the plaintiff, at least during the presentation of plaintiff's case in chief.  Should the defendants want to make additional designations with respect to unavailable witnesses whose testimony will be offered by deposition, covering other subject matters, they should do so during their own case in chief.

### iii. Testimony by adverse parties and those identified with a party in plaintiff's presentation of her case in chief – limits on examination by the defendants

Plaintiff will definitely be calling defendant Haygo Demir as a witness during her case in chief, and may call other witnesses who are employed by DGI during her case in chief (if the defense brings them to Puerto Rico for this purpose before they present them in the defense case in chief.)  She may also present the designated deposition testimony of Tiffany Cox.

145

If plaintiff presents these witnesses at trial, she is entitled to ask them leading questions, pursuant to the provisions of Federal Rules of Evidence 611(c).  Mr. Demir is an "adverse party." Other potential witnesses are current DGI employees, and as such, "witnesses identified with an adverse party," pursuant to Rule 611(c).  In the case of Rachel Doherty, a DGI Vice President and part of the "management team," she is the functional equivalent of an adverse party.

Accordingly, on plaintiff's examination of these witnesses, leading questions are appropriate. On the other hand, when DGI and Demir's attorney engages in "cross examination" of these witnesses during plaintiff's case in chief, he should not be allowed to ask leading questions. As stated by the Advisory Committee in its notes to Rule 611(c),  the rule speaks of leading questions "ordinarily"being "permitted on cross-examination.  Such leading questions should not be permitted when the testimony is offered by an adverse party or a witness identified with an adverse party:

> "The purpose of the qualification 'ordinarily'is to furnish a basis for denying the use of leading questions when the cross-examination is cross-examination in form only and not in fact, as for example, the 'cross-examination'of a party by his own counsel after being called by the opponent (savoring more of redirect) ...."

*See, also,* <u>*Alpha Display Paging v. Motorola,*</u> *867 F.2d 1168, 1171 (8th Cir 1989)* ("Generally, when a witness identified with an adverse party is called, the roles of the parties are reversed.  Leading questions would be appropriate on direct examination but not on cross examination.")

In conducting its examination of defendant Demir and of DGI employees who may be presented in plaintiff's case in chief, the defendants should also be limited to the scope of the examination presented by the plaintiff in her case in chief, for the reasons set forth above with

respect to deposition testimony by Mr. Demir or by DGI employees.

**iv. The jury cannot be informed of the statutory caps or of the automatic doubling of damages**

The 1991 Amendments to Title VII prohibit informing the jury of the statutory caps. *See, Hernández-Miranda v. Empresas Díaz Massó, 651 F.3d 167, 173 (1ˢᵗ Cir., 2011)* (*"juries are not advised of the cap to ensure that no pressure, upward or downward, will be exerted on the amount of jury awards by the existence of the statutory limitations." (internal quotes omitted). See, also, 42 U.S.C. §1981(a)(c)(2)* .

This court has consistently applied the same reasoning to the automatically doubling of damage awards pursuant to the law of Puerto Rico. The jury should not be influenced, either upward or downward, by the cap or by the doubling of the award. *See, Campos-Orrego v. Rivera, 175 F.3d 89, 96 (1ˢᵗ Cir., 1999).*

It should also be noted that the doubling of the award is entirely independent of a punitive damage award, which depends upon an increased degree of culpability on the part of the defendants. *See, Sanchez v. Puerto Rico Oil Co., 37 F.3d 712 (1ˢᵗ Cir. 1994).* The Puerto Rico Supreme Court has characterized the doubling under Puerto Rico law as manifesting the intent of the legislature "to devise a formula to redress damages arising from discrimination in employment." *Garcia Pagan v. Shiley Caribbean, 122 D.P.R. 193 (1988).* Thus, a plaintiff can receive both the doubling (to compensate) and punitive damages (to punish or deter.)

**B. Defendants**

The defendants request that this court permit the parties to read depositions into the record

147

instead of requiring use of the audio-taped versions of the depositions.

**14.      RESERVATIONS**

1.      The parties reserve the right to present such rebuttal witnesses and  documentary evidence on rebuttal as may be necessary without prior notice thereof to the other party.

2.      The parties reserve the right to not use any of the exhibits herein announced and no adverse inference will be drawn from her failure to present them at trial.

3.      The parties reserve the right to not use any of the witnesses announced herein and no adverse inference will be drawn from its failure to present them at trial, unless special circumstances warrant such an inference.

4.      The parties reserve the right to use exhibits announced by opposing parties and to use witnesses announced by the other parties.

5.      This pretrial order may be modified at the trial of this action, or prior thereto, to prevent manifest injustice.  Such modification may be made either on application of counsel for the parties or on motion of the Court.

Respectfully submitted in San Juan, Puerto Rico this  9th  day of November, 2011.

**Representing plaintiff**                    **Representing Defendants**

Berkan/Méndez                                 SCHLESINGER & COTZEN, P.L.
Calle O' Neill G-11                           799 Brickell Plaza, Suite 700
San Juan, Puerto Rico 00918-2301              Miami, Florida 33131
787-764-0814; fax 787-250-0986               Phone: 305-373-8993; Fax: 305-373-8090
bermen@prtc.net

                                              Michael J. Schlesinger
Judith Berkan, ID 200803                      Florida Bar No. 141852
berkanj@microjuris.com                        mjs@scflalaw.com

Mary Jo Méndez ID # 209407                    Michael L. Cotzen
mendezmaryjo@microjuris.com                   Florida Bar No. 166472
                                              mc@scflalaw.com
by: /s/ Judith Berkan
        Judith Berkan, ID 200803              Ferraiuoli Torres Marchand & Rovira, P.S.C.
                                              Plaza Building, Suite 403
                                              #221 Ponce de León Avenue
                                              San Juan, Puerto Rico 00917
                                              Telephone: (787) 766-7000;  Fax: (787) 766-7001

                                              María Judith Marchand-Sánchez
                                              USDC-PR No. 206602
                                              nmarchand@ftmrlaw.com
                                              Juan R. Rivera-Font
                                              USDC-PR No.221703
                                              jrivera@ftmrlaw.com

                                              by:  Michael L. Cotzen
                                                   Michael L. Cotzen